**UNITED STATES of America,
Appellant,**

v.

**LEVY AUTO PARTS OF
CANADA, Appellee.**

**UNITED STATES of America,
Appellant,**

v.

**Morris P. LEVY, Al Raskin, Appellees.**

**Nos. 85–5006, 85–5026.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 10, 1985.

Decided April 10, 1986.

Rehearing and Rehearing En Banc
Denied May 19, 1986.

---

William G. Otis, Asst. U.S. Atty. Gen. (Joseph J. Aronica, Asst. U.S. Atty., Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellant.

Milton Eisenberg (Jack B. Gordon, Fried, Frank, Harris, Shriver & Jacobson, Plato Cacheris, Hundley & Cacheris, Walter J. Bonner, Thomas A. Guidoboni, Bonner, O'Connell & Scheininger, Washington, D.C., on brief), for appellees.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

We are confronted with the difficult question of whether venue for the prosecution of a foreign conspiracy may properly be laid, under 18 U.S.C.A. § 3238, in the district in which a co-conspirator was first arrested, when the indictment alleges minimal contacts with another district arguably sufficient to have warranted prosecution there under 18 U.S.C.A. § 3237(a). The district court held the contacts with the Western District of Michigan preempted venue in the Eastern District of Virginia, where the co-conspirator was first arrested, and dismissed the indictment. Because the contacts with the Western District of Michigan were belated and only ancillary to the primary purpose of the conspiracy, we conclude that venue was properly laid in the Eastern District of Virginia under § 3238.

I.

Levy Auto Parts of Canada and Morris P. Levy and Al Raskin, Canadian nationals and executive officials of Levy Auto Parts, were indicted in the Eastern District of Virginia and charged with having conspired among themselves and with one Saeed Zakaria, a citizen of Pakistan, to violate the Arms Export Control Act and its implementing regulations. 22 U.S.C.A. §§ 2751–2794. The alleged object of the conspiracy was to procure the exportation of M60 tank engines to Iran under export licenses obtained on the basis of false certificates

948

showing the ultimate destination of the tank engines to be Pakistan.

The indictment alleged 26 overt acts performed in furtherance of the conspiracy. Twenty-four of these acts were alleged to have occurred in April, May and June of 1981. Most of these alleged acts were communications between Levy or Raskin in Toronto or Athens, Greece and Zakaria or others in Pakistan or Iran. During this period, the only hints of domestic activity are allegations that Raskin sent a telex to Zakaria advising that certain requested manuals and other documents containing technical information were being sent to him by an American Airlines flight from Toronto to New York and thence by Pakistan International Airlines to Pakistan, and that, four days later, Zakaria was informed by PIA of the arrival of the parcel in Pakistan from Toronto.

This flurry of communications, as alleged in the indictment, ended in June 1981 with a telex from Zakaria to a deputy minister of defense for the Islamic Republic of Iran advising him of transportation costs from Athens, Greece to Bandar Abbas, Iran. Then, somewhat inexplicably, the indictment charges that eight months later, on February 3, 1982, Benjamin Levy, the unindicted president of Levy Auto Parts, telephoned a Mr. Rouse of Teledyne Continental Motors requesting price quotations on parts necessary to convert a 1790–2A engine to a 1790–2D engine. That was overt act number 25 in the indictment.

Overt act number 26 alleges that Mr. Rouse sent price quotations to Benjamin Levy on February 3, 1982, the day of the telephonic request.

While it does not appear on the face of the indictment, it is agreed that the headquarters of Teledyne Continental Motors is in Muskegon in the Western District of Michigan.

Elsewhere in the indictment, it appears that Iran's M60 tanks were equipped with 1790–2A engines. Production of those engines had been discontinued, and the replacement engines discussed in the communications charged as the first 24 overt acts were 1790–2D engines. There is no reference to conversion kits in the indictment until it is charged that price information was requested and sent in overt acts numbers 25 and 26.

It is thus unapparent on the indictment what, if any, relationship there was between Benjamin Levy's request for price information on conversion kits and the earlier allegations of overt acts in furtherance of the conspiracy involving the exportation of complete model 1790–2D engines. Benjamin Levy is said to have been the president of Levy Auto Parts, but it is not alleged that he was a co-conspirator with Morris Levy, Al Raskin and Zakaria. There is no suggestion that Mr. Rouse of Teledyne Continental was, or might have been, a conspirator. The indictment does not disclose the reason for Benjamin Levy's request for price information on conversion kits or what he did with the information when he received it. Generally, the indictment charges that the purpose of the conspiracy was the illegal exportation of tank parts to Iran, but there is no allegation that any of the alleged conspirators attempted to sell conversion kits to Iran. The communications charged as the first 24 overt acts all are concerned with the exportation of complete tank engines.

II.

On March 25, 1982, Zakaria arrived at Dulles International Airport in the Eastern District of Virginia. He was detained when a routine customs inspection revealed that he was carrying documents concerned with the exportation of M60 tank engines, transmissions and spare parts for both to Iran. Among them were communications from Levy Auto Parts in Toronto. The agent in charge of the field office of the Customs Service was summoned and, according to the agent's affidavit in support of an arrest warrant, Zakaria apparently talked readily to him. He admitted that he had dealt with the Iranians, and he had reached an agreement with them for the sale of M60 tank parts upon his obtaining false end user certificates from Pakistan.

He said that his son-in-law, Amin Din, of the District of Columbia, was to have been in charge of the American end of the venture.

According to the affidavit, the agent then called Mr. Din and told him of the detention of his father-in-law on suspicion of violating the export laws in connection with the sale of M60 tank parts to Iran. Din responded that the deal had not gone through because Pakistan had declined to supply the false end user certificates. Din agreed to go to the airport, where there was further conversation with the agent.

Zakaria and Din were arrested on a complaint charging them with conspiring among themselves and with others to sell munitions to Iran in violation of the general conspiracy statute. 18 U.S.C.A. § 371.

Later, pursuant to a plea agreement, Zakaria entered a plea of guilty to an information charging him and Kabanza, Inc. with counseling, aiding and abetting the use of a false end user certificate in an application for an export license for goods on the United States Munitions Control List in violation of 22 U.S.C.A. § 2778 and 22 C.F.R. §§ 127.01(c) and 127.02. Zakaria appears to have been chairman of the board of Kabanza, and his son-in-law, Din, was one of its officers. So far as appears, Din was not prosecuted.

### III.

■ Initially, the court was concerned with the applicability of § 3238 to this case, on the possibility that Zakaria was not "arrested" or was not a "joint offender" within the meaning of that statute. Neither statutory argument has merit. Although Zakaria pled guilty to a charge of counseling, aiding and abetting, he was arrested upon a complaint charging a conspiracy in violation of 18 U.S.C.A. § 371. Given the complaint and the affidavit on which it was based, Zakaria was "restrained of his liberty in connection with the offense" with which these defendants were charged, *see United States v. Erdos*, 474 F.2d 157, 160 (4th Cir.1973); *United States v. Catino*, 735 F.2d 718, 724 (2d Cir.1984), and therefore was "arrested" within the meaning of § 3238.

■ Similarly, we do not think that Zakaria's plea to a lesser, but closely related, substantive offense changes his status as a "joint offender." The customs agent's affidavit clearly discloses that Zakaria and the present defendants were suspected of concerted criminal activity. There is nothing in § 3238 which prevents the prosecution from reaching a plea agreement with a suspected joint offender in exchange for information aiding the prosecution of other offenders. Thus, it is entirely appropriate to treat Zakaria's arrest as that of a joint offender within the meaning of § 3238.

### IV.

The defendants do not contend that venue might be laid in the Eastern District of New York because the air shipment of the parcel containing manuals and other documents was through that district. They do not contend that Zakaria or Din did anything in the District of Columbia to support venue in that district. They do contend that venue could and should have been laid in the Western District of Michigan on the basis of the 25th and 26th alleged overt acts.

Article III, § 2 of the Constitution of the United States provides that "the Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." Congress has implemented the first clause by various statutory provisions addressing situations in which a crime involves more than one district. The general provision is 18 U.S.C.A. § 3237(a), authorizing prosecution in any district in which an offense "was begun, continued, or completed." The second clause was implemented by the predecessors of what is now § 3238. As revised and enacted into positive law in 1948, it reads:

§ 3238. Offenses not committed in any district.

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

The 1948 revision inserted the words "begun or" in the first line of the section. The Revisor's Note says those words were inserted "to clarify the scope of this section and section 3237 of this title." This leads the United States to contend that § 3238 is now a continuing offense statute comparable to § 3237(a) and that venue may be founded upon it if the offense was begun abroad even though it may have involved substantial activity in one or more districts within the jurisdiction of the United States. The defendants, on the other hand, taking their cue from the section's title, insist that venue may not be founded upon § 3238 if the offenses involved any activity in the United States, however predominantly foreign the offenses may have been.

The defendants offer as an explanation of the insertion of the words "begun or" an intention to reverse the result in the old case of *United States v. M'Gill,* 4 U.S. (4 Dall.) 426, 1 L.Ed. 894 (1806). In *M'Gill,* the defendant was prosecuted for murder. He struck the fatal blow while on shipboard on the high seas, but the victim did not die until after he had been put ashore outside the jurisdiction of the United States. The Court held that the crime of murder was not complete until the victim's death and, hence, there could be no prosecution for murder under the predecessor of § 3238. *Id.* 4 Dall. at 429, 4 U.S. at 429.

The suggestion that the 1948 amendment of § 3238 was designed to take care of the more than 140 year old *M'Gill* problem is without foundation. The 1948 amendment of § 3238 would not take care of the basic *M'Gill* problem. If the victim died on foreign land outside the jurisdiction of the United States, the infliction of the mortal wound on the high seas would still not be murder, and the actor would be subject to prosecution in a district court in the United States only for the assault.

The Congress knew what it was doing, however. In the same bill in which it accomplished the 1948 amendment of § 3238, it provided in 18 U.S.C.A. § 3236 that in all cases of murder or manslaughter the offense shall be deemed to have been committed in the place where the injury was inflicted, regardless of the place of death. That took care of the problem in domestic as well as in foreign settings and completely obviated any need stemming from the *M'Gill* problem to amend § 3238.

V.

While the 1948 amendment of § 3238 did not have the limited purpose suggested by the defendants, its actual purpose is not clearly apparent. Since it now applies to offenses "begun or committed" upon the high seas or outside the jurisdiction of any state or federal district, it may be viewed as a continuing offense section. The cryptic Revisor's Note that the 1948 amendment was enacted to "clarify the scope" of § 3238 and § 3237 suggests some intention to harmonize those sections and make them comparable. Retention of the title "Offenses not committed in any district," however, suggests congressional intention not to radically alter the earlier reach of that section. Moreover, in construing the statute, the higher authority of Article III, § 2 of the Constitution must be respected and observed.

There is little judicial precedent to guide us.

In *United States v. Gilboe,* 684 F.2d 235, 239 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983), there is a dictum that § 3238 applies only to those offenses indicated by the section's title. *Id.* at 239. *Gilboe,* however, was a

vastly different case. Gilboe was prosecuted for two frauds of global proportions. He was headquartered in Hong Kong, but in connection with one of his ventures, he sought to charter ships through brokers in the Eastern District of New York, and the large sums of money generated by his ventures were banked through banks in the Southern District of New York. He was arrested in Connecticut.

Though the District of Connecticut was not shown to have had any other connection with the offense, Gilboe objected to venue in the Southern District of New York. He insisted that venue could only be laid in the District of Connecticut under § 3238. The Court of Appeals for the Second Circuit very properly upheld venue in the Southern District of New York under § 3237(a), in which substantial portions of the offenses had taken place.

Contrary to the dictum in *Gilboe*, the Fifth Circuit has held that venue may properly be laid under § 3238 in the district of arrest, notwithstanding the fact that substantial activity in furtherance of the conspiracy took place in another district. *United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir.1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Williams*, 589 F.2d 210, 213 (5th Cir.1979), *adopted in pertinent part*, 617 F.2d 1063, 1071 (5th Cir.1980) (*en banc*).

*Erwin* and *Williams* involved drug importation conspiracies in violation of 21 U.S.C.A. § 963. In *Williams*, an overt act in furtherance of the conspiracy took place in New York and the defendant argued that venue was proper only in that district under § 3237(a). *Williams*, 589 F.2d at 213. The court rejected Williams' "erroneous premise" and held that "a suggestion that venue is proper under § 3237(a) will not serve to divest venue from another judicial district if venue is proper in that district under § 3238." *Id.*

The defendants argue that *Williams* and *Erwin* are inapposite because there is no requirement that an overt act be proven to make out a conspiracy under 21 U.S.C.A. § 963. *See United States v. Pool*, 660 F.2d 547, 560 (5th Cir.1981). The defendants contend that these cases mean only that venue for conspiracies which require no overt act may be established under § 3238 even if venue in another district under § 3237(a) would be proper.

We cannot accept the suggested distinction of *Williams* and *Erwin*. It is true that an offense is made out under § 963 upon direct proof of a conspiracy without the necessity of proof of any act in furtherance of it. However, proof of overt acts may strongly support other proof of the conspiracy, and proof of overt acts in New York discloses that the conspiracy had a presence in New York and was alive and well at the time.

While it was unnecessary in *Williams* and *Erwin* that the indictment charge any overt act in furtherance of the conspiracy, it may be said with equal assurance that it was unnecessary that the prosecutor in this case allege overt acts 25 and 26. According to the indictment, the conspiratorial agreement had been entered into and numerous acts in furtherance of it performed long before Benjamin Levy's inquiry about prices of conversion kits. The offense of conspiracy had been fully committed outside the United States, and many acts in furtherance of it had been done in Canada, Pakistan, Greece and Iran. If the unseasonable inquiry about prices of conversion kits had any connection with the conspiracy to sell complete engines and transmissions, apparently it was a tenuous one. The allegations of overt acts 25 and 26 had a quality of surplusage, just as the allegation of New York activity in *Williams*.

In *Williams*, the Fifth Circuit explicitly recognized that venue probably might have been laid in New York under § 3237(a). Its explicit holding was that there is an overlap between the two sections, and that venue under § 3238 is appropriate notwithstanding the fact that venue in another district also could have been appropriate under § 3237(a).

## VI.

This is not a case calling for a broad holding. It is not a case of a conspiracy formed abroad but producing substantial activity in furtherance of its purpose in the United States. Had the conspiracy succeeded and the conspirators applied for and obtained an export license based upon false Pakistani certificates so that crucial activity would have occurred in the District of Columbia, we would perhaps have had a different case.

■ Here, the aborted conspiracy was essentially foreign. Substantial activity in the District of Columbia was contemplated, but venue could not have been laid in the District of Columbia on the basis of contemplated activity which was frustrated before it began. If, as we have seen, the inquiry in the Western District of Michigan about prices of conversion kits had any connection with the charged conspiracy, it was insubstantial and quite insufficient in itself to divest the conspiracy of the essential foreign flavor it possessed. Under these circumstances, we hold that speculation that venue might have been laid in the Western District of Michigan is an insufficient basis for a conclusion that venue under § 3238 in the Eastern District of Virginia was improper.

## VII.

■ Article III, § 2 of the Constitution requires that local crimes be prosecuted locally in order to alleviate a defendant's hardship at being sent to "a strange locality to defend himself against the powerful prosecutorial resources of the Government." *Dupoint v. United States*, 388 F.2d 39, 44 (5th Cir.1967). When a conspiracy is formed in one district and overt acts are done in furtherance of it in other districts, however, venue may be laid for the prosecution of all the conspirators in any one of those districts. *See* 2 Wright, *Federal Practice & Procedure* § 303. That is not a violation of the Constitution's command of local prosecution for local crimes, though some of the co-conspirators, themselves, may have had no direct connection with the district in which venue is laid. *See Hyde v. Shine*, 199 U.S. 62, 76–77, 25 S.Ct. 760, 761–62, 50 L.Ed. 90 (1905). Nor is it a violation of that command when, as here, venue is laid under § 3238 in the district of arrest of one of the co-conspirators when conspiratorial activity in other districts is no more than slight.

Moreover, there seems to be no unfairness in the prosecution of these defendants in the Eastern District of Virginia. None resides in the Western District of Michigan. None appears to have a substantial connection with that district. Except that the Eastern District of Virginia is somewhat more distant from Toronto than the Western District of Michigan, there is nothing to suggest that trial in the Eastern District of Virginia would be more burdensome to these defendants than trial in the Western District of Michigan. Offsetting the fact that northern Virginia is not as close to Toronto as is Muskegon, there is the fact that this investigation naturally and properly developed in the Eastern District of Virginia with a substantial investment of time and energy on the part of prosecutors and grand jurors. *Cf.* S.Rep. No. 146, 80th Cong., 1st Sess. (1963), *reprinted in* 1963 U.S.Code, Cong. & Ad.News at 660–61 (noting that § 3238 was intended to eliminate the expense of separate grand juries, indictments and trials of joint offenders).

Assuredly prosecution in the Eastern District of Virginia at Alexandria would place upon these defendants no greater burden than that frequently experienced by co-conspirators required to defend themselves in districts far from homes and normal activities when venue is laid under § 3237(a). We perceive no essential unfairness in permitting the prosecution in the Eastern District of Virginia to proceed.

## VIII.

We conclude that the alleged activity in the Western District of Michigan that, at best, was slight and tangential, did not make § 3238 inapplicable. Venue in the Eastern district of Virginia under § 3238

was proper, and the order of the district court dismissing the indictment is reversed.

REVERSED.