13-822-cr
*United States v. Miller*

𝔍𝔫 𝔱𝔥𝔢
𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔉𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

—————————

August Term, 2013

(Argued: January 27, 2014      Decided: December 16, 2015)

No. 13-822-cr

—————————

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

KENNETH L. MILLER,

*Defendant-Appellant*.

—————————————————

B e f o r e :

CABRANES, CARNEY, and DRONEY, *Circuit Judges*.

—————————————————

Appeal from a final judgment of the United States District Court for the District of Vermont (William K. Sessions, III, *Judge*) convicting Defendant-Appellant Kenneth Miller, following a jury trial, of aiding and abetting an international parental kidnapping in violation of the International Parental Kidnapping Crime Act. *See* 18 U.S.C. §§ 1204, 2. Appellant contends that venue

was not properly laid in the District of Vermont under the "high seas" venue statute, 18 U.S.C. § 3238, because certain offense conduct was committed within the United States and none was committed in the State of Vermont. We reject that argument and conclude that venue in Vermont was proper under § 3238 because the crime took place in its essence outside the jurisdiction of the United States and an offender, Kenneth Miller, was arrested in Vermont. Accordingly, we affirm the judgment of conviction.

AFFIRMED.

---

DAVID J. WILLIAMS (Brooks G. McArthur, *on the brief*), Jarvis, McArthur & Williams, LLC, Burlington, VT, *for Defendant-Appellant Kenneth Miller*.

EUGENIA A.P. COWLES, Assistant United States Attorney (Paul Van De Graaf and Gregory L. Waples, Assistant United States Attorneys, *on the brief*), for Tristam J. Coffin, United States Attorney for the District of Vermont, Burlington, VT, *for Appellee the United States of America*.

---

SUSAN L. CARNEY, *Circuit Judge*:

In this appeal, we consider whether venue for a criminal prosecution may lie pursuant to 18 U.S.C. § 3238, the "high seas" venue statute, when certain

essential offense conduct is committed outside of the jurisdiction of the United States, but other offense conduct is committed within. We answer that it may.

## BACKGROUND

Defendant-Appellant Kenneth Miller ("Kenneth"),[1] an Amish Mennonite minister and resident of Virginia, was convicted by a jury sitting in the United States District Court for the District of Vermont (William K. Sessions III, *Judge*) of one count of aiding and abetting the removal of a child from the United States with the intent to obstruct the lawful exercise of parental rights, in violation of the International Parental Kidnapping Crime Act (the "Act"), *see* 18 U.S.C. §§ 1204, 2. The child in question was the daughter of one of Kenneth's acquaintances, Lisa Miller ("Lisa"), and Janet Jenkins ("Janet"), Lisa's former civil union partner under Vermont law. The statement of facts set forth below is drawn principally from the evidence presented at Kenneth's criminal trial in August 2012. The material facts are not disputed.

---

[1] Three individuals bearing the surname "Miller"—none related to any other—are involved in this narrative. To avoid confusion, we use primarily their first names here.

**A. Lisa and Janet's Civil Union, Separation, and Custody Dispute**

In 2000, while residing in Virginia, Lisa and Janet entered into a civil union in Vermont. In April 2002, while both were still residing in Virginia, Lisa gave birth in Virginia to a daughter, "IMJ." Under Vermont law, both Lisa and Janet are IMJ's lawful parents. A few months after IMJ's birth, in the summer of 2002, Lisa, Janet, and IMJ moved from Virginia to Fair Haven, Vermont.

In the fall of 2003, Lisa and Janet separated. Lisa left Vermont and returned to Virginia, taking IMJ with her. Janet remained in Vermont.

In November 2003, Lisa filed a petition for divorce in Family Court in Rutland, Vermont, seeking formal dissolution of her civil union with Janet and custodial rights over IMJ. In June 2004, that court granted Lisa temporary physical and legal rights, subject to certain visitation rights in Janet.

In July 2004, Lisa petitioned the Circuit Court of Frederick County, Virginia, seeking a decree that she was "the sole parent of" and had "sole parental rights over" IMJ and that any parental rights claimed by Janet were "nugatory, void, illegal and/or unenforceable." *See Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 332 (Va. Ct. App. 2006) (internal quotation marks omitted). In 2008, after protracted litigation in the Virginia courts, the Supreme Court of

4

Virginia affirmed that Vermont's courts—and not Virginia's— had jurisdiction over Lisa and Janet's custody dispute. *See Miller-Jenkins v. Miller-Jenkins*, 661 S.E.2d 822, 825, 827 (Va. 2008).

Meanwhile, in September 2004, after Janet reported to the Vermont Family Court that Lisa had failed to allow Janet her scheduled contact with IMJ, that court held Lisa in contempt. Two years later, in December 2006, the court again held Lisa in contempt for failing to comply with its visitation orders.

In June 2007, the Family Court entered a final order dissolving Lisa and Janet's civil union, in resolution of Lisa's 2003 petition. In conjunction with the dissolution order, and calling the matter a "close case" in light of the "continued interference with the relationship between IMJ and Janet," the court assigned Lisa sole physical and legal custody of IMJ, subject to limited visitation rights in Janet. Transcript of Criminal Trial, *United States v. Miller* (Aug. 8, 2012) at 65-66, 68; *see Miller-Jenkins v. Miller-Jenkins*, 12 A.3d 768, 772 (Vt. 2010). After their civil union was dissolved, Lisa continued to disregard the court's visitation orders: As the Vermont Supreme Court later noted, the Family Court held Lisa in contempt on a total of seven occasions between 2007 and 2010 for violating the court's parent-child contact orders. *Id.* at 773.

5

Citing the repeated contempt rulings entered by then, in August 2009 Janet returned to Vermont Family Court seeking transfer from Lisa to herself of primary parental rights and responsibilities for IMJ. Janet's motion was pending in Vermont when, in the fall of 2009, and without warning to Janet, Lisa absconded from the United States with IMJ.

**B. Lisa's Removal of IMJ from the United States**

On September 21, 2009, accompanied by a person identified only as "Philip," Lisa and IMJ traveled by car from their home in Lynchburg, Virginia, through Maryland and Pennsylvania, to Buffalo, New York. On September 22, Lisa and IMJ crossed the international border from Buffalo into Canada by taxi. Later that day, Ervin Horst, a Mennonite pastor from Ontario, Canada, drove Lisa and IMJ to the Toronto airport. From there, Lisa and IMJ flew to Mexico City, proceeding next by air from Mexico through El Salvador, and then to Managua, Nicaragua. The record before us does not reflect any subsequent re-entry by them into the United States.

**C. Proceedings in the District Court**

On November 18, 2011, a little over two years after Lisa and IMJ quit the United States, the government filed a criminal complaint in the District of Vermont, charging Kenneth with aiding and abetting Lisa's alleged violation of the Act.[2] The government's theory was that Kenneth organized Lisa's departure from the United States with IMJ by arranging for their travel from Lynchburg, Virginia, to Nicaragua; engaging the individuals who accompanied and assisted them in their travels; and planning for their reception in Nicaragua.

When he was charged, Kenneth had been serving as a missionary in Ireland since the summer of 2010. Kenneth voluntarily returned from Ireland to Vermont to face the charges filed there. He was arrested in Vermont on December 6, 2011.

On December 15, 2011, a federal grand jury sitting in Burlington, Vermont, returned a one-count indictment against him. The Grand Jury charged as follows:

> From on or about September 21, 2009 to on or about September 23, 2009, in the District of Vermont and elsewhere, defendant KENNETH L. MILLER aided and abetted Lisa Miller in

---

[2] Earlier, on April 27, 2010, the government filed a criminal complaint in the District of Vermont charging Lisa as a principal in the same crime. The record before us does not reflect any appearance by Lisa in the United States in response to that complaint.

7

the removal of a child from the United States with the intent to obstruct the lawful exercise of parental rights.

(18 U.S.C. §§ 1204 and 2)

J.A. 23. Kenneth entered a plea of not guilty.

Kenneth then moved to dismiss the indictment for, *inter alia*, improper venue. As to venue, he contended principally that venue in Vermont was improper because he personally was not alleged to have committed any criminal act there. The government opposed the motion, maintaining that venue was proper by reference either to where he acted or to where Lisa acted, and that the evidence at trial would establish that venue in Vermont was proper under either of two venue statutes: § 3237 or § 3238 of title 18.

Section 3237, "Offenses begun in one district and completed in another," allows venue to be set "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). The government submitted that § 3237 could support venue in Vermont because the act that it cast as the "most significant" of the international kidnapping that Kenneth was alleged to have aided and abetted—Lisa's removal of IMJ from the jurisdiction of the Vermont Family Court, in obstruction of Janet's parental rights as established by that court—took place in Vermont. J.A. 90.

8

The government also asserted that venue in Vermont would lie under 18 U.S.C. § 3238. Section 3238, "Offenses not committed in any district" (and sometimes referred to as the "high seas" statute, *see, e.g., United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002)), lays venue for "trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, . . . in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought." As to § 3238, the government argued that, because the crux of the underlying offense conduct —that is, Lisa's removal of IMJ from the United States and into Canada— occurred outside of the jurisdiction of any particular State or district, venue lay in Vermont, where Kenneth was arrested.

The District Court denied Kenneth's motion to dismiss, concluding preliminarily that the government might prove venue at trial under either theory. *See United States v. Miller*, No. 2:11-cr-161-1 (WKS), 2012 WL 1435310, at *6-9 (D. Vt. Apr. 25, 2012). After the court's ruling, the government informed the court that, at trial, it would seek to establish venue in Vermont under § 3238 only.

Kenneth's trial began in August 2012 and lasted four days.  The government presented the following evidence bearing on Kenneth's guilt as well as on the question of venue.  It adduced cell phone records showing that, on September 21, 2009, Kenneth's cell phone was in regular contact with that of the person escorting Lisa and IMJ by car from Virginia to the Buffalo area.  It introduced testimony that Kenneth arranged for Ervin Horst (in Canada) to take Lisa and IMJ from the Canadian border to the Toronto airport and for Timothy Miller ("Timothy"), a Mennonite pastor living in Nicaragua, to purchase international airline tickets for Lisa and IMJ for their flights from Canada through Mexico and El Salvador to Nicaragua, and to pick them up at the airport in Nicaragua.[3]  Phone records presented by the government also showed that Kenneth and Timothy were in frequent contact in the lead-up to Lisa and IMJ's arrival in Nicaragua.  In addition, trial testimony reflected that, after Lisa arrived in Nicaragua with IMJ, Kenneth sent money to her and called her at Timothy's home, remaining in contact and supporting her in her retention of IMJ abroad.  No evidence adduced at trial, however, suggested that Kenneth himself entered

---

[3] The government also charged Timothy in Vermont with aiding and abetting IMJ's kidnapping.  The charge against him was later dropped in return for his agreement to cooperate with the investigation and to provide his testimony, if needed.

10

Vermont or even left Virginia at any point during his aiding and abetting Lisa's flight.

After the close of the evidence, the District Court delivered the following instructions to the jury about venue under § 3238 and the jury's obligation to make a determination in that regard:

> If you find that the government has proved beyond a reasonable doubt all of the elements of the offense that I have described for you, you must also determine whether venue is appropriate in the District of Vermont. In this regard, the government must show by a preponderance of the evidence that the essential conduct of removing a child from the United States took place at least in an essential part outside the United States. The government must also show by a preponderance of the evidence that Kenneth Miller was first arrested in the District of Vermont. The District of Vermont includes the entire territory of the state.

J.A. 206.[4]

The jury found Kenneth guilty of aiding and abetting Lisa in her unlawful removal of IMJ from the United States. Completing a printed jury verdict form, it also determined that venue in the District of Vermont was "appropriate," "[t]aking into account the facts of this case and the specific legal instructions given." J.A. 209.

---

[4] These jury instructions closely tracked those proposed by the government in a pre-trial motion for clarification, to which Kenneth objected, reiterating the grounds cited in his motion to dismiss the indictment.

The District Court sentenced Kenneth to a term of imprisonment of 27 months, to be followed by a one-year term of supervised release. It then stayed the sentence and entered an order releasing Kenneth pending this appeal.

## DISCUSSION

On appeal, Kenneth renews much of his challenge to the indictment and his conviction, arguing that venue was not proper in the District of Vermont under 18 U.S.C. § 3238. He contends in main part that venue cannot properly be set under § 3238 unless an offense is wholly committed outside the United States. Kenneth submits that, because substantial offense conduct (by both Lisa and Kenneth) occurred in the United States, § 3238 does not apply, and accordingly the District of Vermont, as the district of arrest only, was not the proper venue for his trial. The government opposes this view, arguing that § 3238 is not so limited and serves to set venue even when some offense conduct occurs within the United States, so long as essential offense conduct occurred outside the United States.

**A. Legal Framework**

"The Constitution twice safeguards the defendant's venue right . . . ." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III provides that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const. art. III, § 2, cl. 3. And the Sixth Amendment directs that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial[] by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. These constitutional guarantees are reinforced by Rule 18 of the Federal Rules of Criminal Procedure, which directs that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.[5]

The Republic's Founders instituted these requirements at the level of our fundamental law, historians tell us, in response to years in which colonists were haled to England to stand trial for treason and other charges based on acts

---

[5] Rule 18 provides in full: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."

undertaken on this side of the Atlantic. *See* Lester B. Orfield, *Venue of Federal Criminal Cases*, 17 U. Pitt. L. Rev. 375, 379 (1956) ("Some acts of Parliament provided for transfer of crimes committed in the Thirteen Colonies to England for trial. The inhabitants of the Colonies objected strenuously, especially as to cases involving charges of treason."). Trial at such a distance from both their homes and actions posed obvious hardships and risked unfairness to defendants, who were then forced to mount a defense without ready access to witnesses who might exonerate them, and who stood to be judged by jurors foreign to them. In *United States v. Johnson*, 323 U.S. 273 (1944), Justice Frankfurter, writing for the Court, observed that the Framers adopted the two constitutional venue provisions "[a]ware of the unfairness and hardship to which trial in an environment alien to the accused exposes him," and that these concerns, in addition to the appearance of and potential for prosecutorial abuse, "are matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests." *Id.* at 275-76. Constitutionally mandating that a trial be held in the state where the wrong was committed —the *locus delicti* —worked to alleviate these concerns.

14

In some cases, the identity of "the State and district wherein the crime shall have been committed" may be easy to determine and compliance with the constitutional mandate not subject to reasonable dispute. For example, the *locus delicti* will be obvious when, in a single place within a single United States district, a lone defendant has begun and completed a single offense in a readily identifiable location. "When a crime consists of a single, non-continuing act, the proper venue is clear: The crime is 'committed' in the district where the act is performed." *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005) ( some internal quotation marks omitted). But when criminal acts continue across boundaries, or when other special circumstances are at play, closer analysis is required. Congress has set venue both by appending specific venue provisions to statutes creating substantive federal crimes and by enacting more generic venue-laying statutes, such as § 3237 and § 3238, at issue here. *See* Fed. R. Crim. P. 18 advisory committee's note to 1944 adoption (cataloguing venue provisions).[6] Along with Rule 18 of the Federal Rules of Criminal Procedure, the latter serve in some measure to provide a default basis for setting venue.

---

[6] Congress has also enacted provisions addressing venue in capital cases, 18 U.S.C. § 3235; venue in cases of murder or manslaughter, 18 U.S.C. § 3236; and made provision for optional venue in cases of espionage and related offenses, 18 U.S.C. § 3239. Rule 18 itself is codified in 18 U.S.C. § 3232.

As we have explained, although the constitutional venue provisions may "establish certain rights, they are often of precious little aid in explaining how the locus of a crime is to be determined." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Congress may "append[] a venue provision to [a] criminal statute[], which provides a method of fixing the place or places of prosecution." *Id.* The International Parental Kidnapping Crime Act, however, contains no such helpful venue provision. We turn, then, to more general principles for determining where the crime was committed.

In *United States v. Anderson*, 328 U.S. 699 (1946), the Supreme Court articulated the standard that still undergirds our analysis: When a criminal statute "does not indicate where Congress considered the place of committing the crime to be, the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 703 (citations omitted). More recently, in *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), the Court built on *Anderson* and articulated a two-part analysis for determining where the wrong was committed and where venue may properly be set. *Rodriguez-Moreno* directs that we first examine the "nature of the crime alleged," seeking to identify the crime's "essential conduct elements." 526 U.S. at 279-80.

16

Second, we identify the locations where the criminal acts were committed. *Id*. at 279; *see also Cabrales*, 524 U.S. at 6-7. Having made those determinations, we then apply the statutes governing venue to identify where venue may properly lie.

In our Circuit, we have also examined the results of our initial venue analysis to ensure that venue does not rest merely on acts that are only "preparatory to the offense," *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989), and that the criminal conduct has "substantial contacts" with the venue, *Reed*, 773 F.2d at 481; *see also United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) (discussing the factors of the substantial-contacts test and clarifying that it may be appropriate to use when a defendant argues that prosecution in a particular venue will cause him hardship, prejudice, or undermine the fairness of his trial). More recently, we have also assessed whether prosecution in the chosen venue would be in some way "reasonably foreseeable" to the accused. *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007); *see United States v. Davis*, 689 F.3d 179, 187-88 (2d Cir. 2012) (observing that "we have recognized in the context of conspiracy . . . [that] venue may lie in a district where the defendant knows or reasonably should foresee that acts in furtherance of the criminal enterprise would take place").

With regard to the first step of the *Rodriguez-Moreno* inquiry, we pause here to stress its focus on the "essential *conduct* element[s]"—not simply the "essential elements"—of the crime:  The determination of criminal venue is informed by where "physical *conduct*" occurred, and not where criminal intent was formed.  *Ramirez*, 420 F.3d at 144-46 (internal quotation marks omitted).  Formation of the mens rea of the crime, essential as it is to criminal culpability, is not sufficient "conduct" to support venue.  *See Rodriguez-Moreno*, 526 U.S. at 279-80 (identifying the place of the "act or acts" and the "conduct" of the accused as crucial to the venue inquiry).  In certain cases, whether effects of the conduct are sustained in another candidate district and are material to the crime—that is, bear on the nature of the crime—may also enter into the analysis of the conduct elements.  *See, e.g., Coplan*, 703 F.3d at 79.  The dispositive elements, however, do not include where the criminal intent may have been formed.

We turn, then, to the place of the relevant physical acts.  As noted above, "[w]hen a crime consists of a single, non-continuing act, the proper venue is clear:  The crime is 'committed' in the district where the act is performed," and the defendant may be prosecuted in that district only.  *Ramirez*, 420 F.3d at 139 (some internal quotation marks omitted).  But when "the acts constituting the

18

crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue. The [C]onstitution requires only that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law." *Reed*, 773 F.2d at 480; accord *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010). Accordingly, § 3237 authorizes venue for continuing offenses, whose commission spans more than one United States district, to be set in more than one location: It provides that "any offense . . . begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

Section 3238 has a different cast, as its colloquial name—the "high seas" venue statute—suggests. Its origins in the Act of April 30, 1790, 1 Stat. 112, 114 (1790), are distinctive: As the First Circuit has described, "[I]t was a clause tacked on to a section defining certain offenses committed 'upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular State', for which offenses the offender was to be adjudged to be 'a pirate and felon', and sentenced to death." *Chandler v. United States*, 171 F.2d 921, 931 (1st Cir. 1948).

Noting its presence on the statute books in a subsequent version for many years since its first enactment, the court opined that it "ought . . . to be given its broad literal meaning," *id.* at 932, and indeed, the provision has been used in cases other than piracy—which, of course, is not mentioned in its text, *see, e.g.*, *United States v. Yousef*, 327 F.3d 56, 114-15 (2d Cir. 2003) (conspiracy to bomb United States commercial airliners); *United States v. Catino*, 735 F.2d 718, 723-24 (2d Cir. 1984) (using a falsely secured American passport).

An additional wrinkle, important here, concerns venue considerations in the prosecution of an aider and abettor, under 18 U.S.C. § 2. "Aiding and abetting" is not a stand-alone criminal offense, of course, but rather "serves as a more particularized way of identifying the persons involved in the commission of the substantive offense." *United States v. Oates*, 560 F.2d 45, 54 (2d Cir. 1977) (citation and internal quotation marks omitted). In such a prosecution, venue may be determined by reference either to the defendant's own accessorial acts or to the acts of the principal in committing the underlying substantive crime. *See United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999); *United States v. Gillette*, 189 F.2d 449, 451-52 (2d Cir. 1951) ("[18 U.S.C. § 2] makes an accessory a principal so that it is now possible to try him where the substantive offense was committed[,]

20

. . . provid[ing] an additional venue [to that provided by the common law].”); *see also United States v. Bowens*, 224 F.3d 302, 311 n.4 (4th Cir. 2000); *Eley v. United States*, 117 F.2d 526, 528 (6th Cir. 1941); Wayne R. LaFave et al., 4 Criminal Procedure § 16.2(g) (3d ed. 2014) (“As to accomplices, the acts of the accomplice constituting the aiding and abetting may have occurred in a different district than the commission of the crime.  In such a case, the prosecutor can choose between those districts in the prosecution of the accomplice.”).

A similar rule has long applied to co-conspirators.  *See* Armistead M. Dobie, *Venue in Criminal Cases in the United States District Court*, 12 Va. L. Rev. 287, 291 (1925) (“It has been held that, as to all the conspirators, the trial may be in any district in which an overt act in furtherance of the conspiracy is performed by one conspirator, though it was not the district of the conspiracy and even though the particular conspirator being tried has never been in the district of the trial.”); *see also* Lester B. Orfield, *Venue of Federal Criminal Cases*, 17 U. Pitt. L. Rev. 375, 384 (1956) (“The old broad rule as to venue in conspiracy cases continues under Rule 18. . . .  There is no right to trial at the place of residence of the conspirator.”).  Accordingly, we have held that “venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator

committed an overt act in furtherance of the criminal scheme." *Rommy*, 506 F.3d at 119. In cases of both conspiracy and aiding and abetting, then, "a defendant need not himself have ever been physically present in a district for a conspiracy [or aiding and abetting] charge against him to be venued there." *Id.* at 120.

These well-established rules represent a deep-rooted concern to serve a variety of goals in establishing venue, including accommodating both defense, prosecution, and judicial interests (for example, by permitting a single trial of all co-conspirators) and that tend to promote the efficient administration of justice, so long as the constitutional limits are observed. The convenience of the defendant is not the dispositive factor: "A foreign courier attempting to import illegal drugs through Kennedy Airport will not find the Eastern District of New York particularly convenient nor would a co-conspirator in Miami who never set foot in New York." *Reed*, 773 F.2d at 481.

Thus, here, as Kenneth concedes, the government is permitted to lay venue by reference to Lisa's actions in removing IMJ, and not solely by reference to Kenneth's actions in aiding and abetting her. Appellant's Br. at 50 ("Venue for this prosecution would have been proper in any judicial district where the principal, i.e. Lisa Miller, could have been charged."). The place of Kenneth's

own physical actions, then, does not unduly constrain our venue inquiry, except in two respects: first, insofar as his arrest in Vermont is necessary to any § 3238 analysis, and second, insofar as he seeks to challenge the result we reach as in conflict with the constitutional goals animating criminal venue strictures.

**B. Section 3238 and Lisa's Offense Conduct**

As described above, the jury was instructed that, to find that venue in Vermont was appropriate, it had to conclude (as it did) that the government had adequately demonstrated that "the essential conduct of removing a child from the United States took place at least in an essential part outside the United States," and that "Kenneth Miller was first arrested in the District of Vermont." J.A. 206, 209. On appeal, Kenneth challenges neither of these predicate findings, but rather argues principally that venue was nonetheless improper under § 3238 because certain of Lisa's offense conduct occurred within the United States: that is, she traveled from Virginia through Maryland, Pennsylvania, and New York, to reach the border with Canada, which she then crossed, completing the crime. Because § 3238 governs venue for crimes "begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district," he

23

urges us to conclude that Lisa's movements toward the Canada-United States border, in her travels from Virginia to Buffalo by car, preclude the government's reliance on § 3238 to set venue.

Applying the *Rodriguez-Moreno* mode of analysis, we first consider the nature of the offense and in that context we identify the conduct that constitutes the essence of the crime that Kenneth was charged with aiding and abetting. We have observed that in this process, "it is often helpful to look to the verbs of a statute in identifying the conduct that constitutes an offense." *Ramirez*, 420 F.3d at 138. We do so cautiously, however, mindful that myopic focus on verbs can lead to overlooking important statutory language that communicates the "nature of the crime alleged," which is the core of the inquiry. *Id.* (quoting *Cabrales*, 524 U.S. at 6-7).

The statute that Lisa (and Kenneth, derivatively, for venue purposes) is charged with violating provides as follows: "Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both." 18 U.S.C. § 1204(a). To establish a removal violating the Act, the

government thus had to prove that (1) IMJ had previously been in the United States; (2) Lisa took IMJ from the United States to another country; and (3) Lisa did so with the intent to obstruct the lawful exercise of Janet's parental rights. *See United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010) (describing the elements required to prove a violation of § 1204(a)).[7] Focusing first on the conduct identified by a verb, we see that in a case such as this, "remov[ing] a child" is the proscribed physical act, and the removal must be from within the United States to outside the United States to violate this statute. The Act is focused on combatting the special problems posed by the crime of international parental kidnapping, not on addressing domestic custody disputes that are played out within the jurisdictions of the various states. Following *Rodriguez-Moreno*, therefore, we conclude that *removing IMJ from the United States*—leaving the jurisdiction of the federal government and crossing the international boundary of the United States—is the essential conduct element of Lisa's crime. *See Miller*, 626 F.3d at 692 (Straub, J., dissenting on other grounds) (identifying "[a]n essential element" of § 1204(a) as "remov[ing] [a child] from the United

---

[7] Michelle Miller, the defendant in the cited opinion, is not related to Kenneth, Lisa, or Timothy Miller.

States" or "retain[ing] him outside of the United States" with intent to obstruct the lawful exercise of the other parent's rights).

As to the second part of the *Rodriguez-Moreno* analysis, in which we identify *where* the offense conduct took place, it seems to us that the act of removal occurred in part on both sides of the Canada-United States border: beginning in the United States, from which IMJ was taken, and completed only once IMJ arrived in Canada and thus had been "remove[d]" from the United States, with the border crossing itself constituting the crux of the crime of removal.

Kenneth argues that even if certain offense conduct occurred outside of the United States, § 3238 does not apply when, as here, the acts comprising the crime were not *wholly* committed outside of the United States. In support, Kenneth points out first that the section is entitled, "Offenses not committed in any district." We cannot agree. We are not persuaded by Kenneth's contention that the title and plain language of § 3238 command such a result. "The title of a statute cannot limit the plain meaning of the text." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (alterations and internal quotation marks omitted). And here, the text of § 3238 invites a broader application than its title might suggest.

26

In particular, the text addresses "offenses *begun or committed* upon the high seas, or elsewhere out of the jurisdiction of any particular State or district." 18 U.S.C. § 3238 (emphasis added). This language makes apparent that § 3238's application is not restricted to offenses *wholly* committed outside the jurisdiction of the United States: The use of the word "begun" in addition to the word "committed" suggests that the statute encompasses offenses "begun" outside the borders of the United States—but ending within our country's borders.

Insofar as Miller can be understood to argue, in the alternative, that § 3238 applies to offenses begun outside of the United States and completed in the United States, but not to offenses begun within the United States and completed without, we do not accept this view either. The statute's text is opaque. A report of the House Judiciary Committee notes that the words "begun or" were added to the statute in 1948 "to clarify [the] scope of this section and section 3237 of this title." Revision of Title 18, United States Code, H.R. Rep. No. 304, at A161 (1947). But unfortunately, we are able to derive little clarification as to the scope of § 3238 from the amendment. *See United States v. Levy Auto Parts of Canada*, 787 F.2d 946, 950 (4th Cir. 1986) (describing the Revisor's Note as "cryptic"). To give each of the words "begun" and "committed" independent meaning, one might

27

read "committed" to mean "wholly committed," and the word "begun" to refer only to offenses begun outside the United States but completed within the United States. *See* Megan O'Neill, Comment, *Extra Venues for Extraterritorial Crimes? 18 USC § 3238 and Cross-Border Criminal Activity*, 80 U. Chi. L. Rev. 1425, 1445 (2013). Or, as the Third Circuit concluded in *United States v. Pendleton*, 658 F.3d 299 (3d Cir. 2011), the word "committed" must "refer to crimes that begin inside the United States but that are in their essence committed abroad," *id.* at 305 (emphasis omitted), while the word "begun" might refer to crimes begun outside the United States—wherever completed.

All of this having been said, the history and text of § 3238 do make clear, at the very least, that the statute focuses on offense conduct outside of the United States. And we can discern no respect in which § 3238's venue-setting provisions fit more naturally when the United States conduct constitutes the completion rather than the beginning of an offense; indeed, for those offenses begun abroad but completed in the United States, one could argue that it is more awkward to set venue based on the district in which the offender—who will more recently have committed offense conduct in the United States—"is arrested or first brought." We thus agree with the *Pendleton* court that the word "committed" in

28

§ 3238 encompasses crimes like Lisa's, "that begin inside the United States but that are in their essence committed abroad." 658 F.3d at 305 (emphasis omitted).

In *Pendleton*, the court considered the question of venue in the context of 18 U.S.C. § 2423(c), which makes a federal crime of traveling in foreign commerce and engaging in illicit sexual conduct with another person. Pursuant to § 3238, the defendant was tried in the district of his arrest. *See id.* at 301, 304. The defendant argued, however, that venue was governed only by § 3237(a), and lay only in the United States district in which he boarded the plane to travel abroad to engage in the proscribed conduct. *See id.* at 303. Although the court agreed that his offense began when he initiated travel in the United States by boarding a plane bound for Germany, it concluded that, because the "crux" of the defendant's offense—the illicit sexual conduct—was "committed" outside of the jurisdiction of any state or district, the crime was "essentially foreign" and § 3238 applied to set venue in the district of his arrest. *Id.* at 304-05 (quoting *Levy*, 787 F.2d at 952).

Here, similarly, the crux of Lisa's crime was the removal of the child from the United States. It was not, for example, simply violating a state court custody order and crossing a state line: Its international nature endowed it with a

different character and consequences.[8] Thus, the offense conduct occurred "in its essence," and the crime was committed and complete, when the child was removed to a jurisdiction outside a state or district. For these reasons, we conclude that Lisa's criminal conduct here, which entailed the crossing of an international boundary with IMJ, was "essentially foreign." Because the underlying offense occurred in its essence abroad—that is, was "committed . . . out of the jurisdiction of any particular State or district"—§ 3238 may be used to establish venue in the district of arrest even though certain offense conduct occurred in the United States.

Further, we do not think that venue becomes improper under § 3238 simply because it might also have been properly laid elsewhere pursuant to § 3237(a).[9] A "suggestion that venue is proper under § 3237(a) will not serve to

---

[8] Among the notable consequences can be, for example, the triggering, for resolution of the custody dispute, of the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11, with its extensive procedures for managing competing judicial systems of different sovereigns in which separated parents and children are located.

[9] Kenneth argues that venue would have been proper under § 3237(a) in the districts in which his or Lisa's acts took place, including Virginia, Maryland, Pennsylvania, and New York. We do not foreclose the possibility that venue might also have been proper in any or all of those districts under § 3237(a). *See United States v. Clenney*, 434 F.3d 780, 781 (5th Cir. 2005) (noting that the parties agreed that venue for the defendant's prosecution for removal in violation of 18 U.S.C. § 1204, "a single, continuing offense," was appropriate under 18 U.S.C. § 3237(a) "in any district in which the offense was

divest venue from another judicial district if venue is [also] proper in that district under [§] 3238." *United States v. Williams*, 589 F.2d 210, 213 (5th Cir. 1979), *adopted in pertinent part*, 617 F.2d 1063, 1071 (5th Cir. 1980) (en banc); *see also Levy*, 787 F.2d at 951.[10]  Instead, where "more than one location" is "implicate[d] . . . , [t]he [C]onstitution requires only that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law."  *Reed*, 773 F.2d at 480.

Our holding today is at odds, we acknowledge, with a passing comment in *United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982), but it is not a comment that we believe binds us.  In *Gilboe*, after suggesting that the accused had waived his argument that venue lay only in one state and only under § 3238, we rejected the argument summarily and on the basis of the statute's title alone, explaining

---

begun, continued or completed").  Nor do we reach the government's argument on appeal that venue may have been properly laid *in the District of Vermont* pursuant to § 3237(a), a position that, according to Kenneth, has been waived and, he argues, is erroneous in any event.

[10] Moreover, as the Third Circuit observed in *Pendleton*, § 3237(a) "does not include a mandatory venue provision."  658 F.3d at 303.  Rather, the statute directs that offenses whose commission spans more than one district "*may* be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a) (emphasis added).

briefly that § 3238 "applies only to offenses 'not committed in any district,' as its title indicates." *Id.* at 238-39. Our holding, however, was that venue was appropriate under § 3237(a). Our reasoning rested on a detailed analysis of the wire fraud prosecution of a foreign defendant—a Norwegian citizen and resident of Hong Kong. *See id.* at 237, 239. Looking to the defendant's telephonic communications between New York City and overseas locations and observing that the proceeds of the fraud were transferred through New York City, we found that the defendant was properly tried in the Southern District of New York under § 3237(a), since the offense had been in part carried out there. *See id.* at 239. With that conclusion, our passing comments regarding § 3238, whose applicability the defendant had urged as an exclusive alternative to § 3237, were rendered dicta.

Our Court has never since relied on or favorably cited *Gilboe*'s comments regarding § 3238. Moreover, our decision in *Gilboe* was issued before the Supreme Court's decision in *Rodriguez-Moreno*, in which (as we have observed above) the Court directed that we must look to the "essential conduct elements" of an offense to determine where venue properly lies. 526 U.S. at 280-81. We conducted no such analysis in *Gilboe*. Accordingly, our dicta in *Gilboe* do not

32

control our decision here.[11] Section 3238 may apply even when certain offense conduct occurs in the United States, if the criminal acts are nonetheless "essentially foreign."

**C. Other Considerations**

To complete our application of § 3238 to Kenneth's venue challenge, we recall that Kenneth was arrested in Vermont, as required to establish venue under the statute. Addressing a concern that might be raised with respect to an aiding and abetting charge, § 3238 in its current form provides for venue in the district "in which the offender, or any one of two or more joint offenders, is arrested or is first brought." The statute thus seems to contemplate establishing venue under the principles of sharing venue for principal and aider-or-abettor, or co-conspirators, that we have discussed above, and there is no disjunction between using Lisa's acts to establish venue for Kenneth in applying the first

---

[11] At least one district court within our Circuit has characterized the *Gilboe* comments as dicta. *See United States v. Bin Laden,* 146 F. Supp. 2d 373, 381 n. 17 (S.D.N.Y 2001); *cf. Levy*, 787 F.2d at 950 (discussing "the dictum in *Gilboe*").

component of § 3238 while using Kenneth's arrest in Vermont to complete the package.[12]

As we have explained elsewhere in the context of considering venue under § 3237(a), when a defendant argues that his prosecution in the contested district will result "in a hardship to him, prejudice[ ] him, or undermine[ ] the fairness of his trial," we supplement our venue analysis with the "substantial contacts" inquiry, which "takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *Coplan*, 703 F.3d at 80 (alterations and internal quotation marks omitted); *see also Ramirez*, 420 F.3d at 139 ("[W]hen venue may properly lie in more than one district under a continuing offense theory, we should also ask whether the criminal acts in question bear substantial contacts with any given venue." (internal quotation marks omitted)).  "The outer limits on how broadly Congress may define a continuing offense and thereby create multiple venues [are]

---

[12] Nor are we troubled by Kenneth's complaint that, upon his return from Ireland to address these charges, he first landed elsewhere in the United States, but the government chose not to arrest him until he arrived in Vermont.  Vermont as a state has a substantial interest in these proceedings, as we have discussed, and we have been directed to no authority requiring the government to make an arrest at its first opportunity.

unclear," we have observed, and "although the venue requirement is principally a protection for the defendant, other policy considerations are relevant to the proper venue in particular cases." *United States v. Saavedra*, 223 F.3d 85, 92 (2d Cir. 2000) (citation and internal quotation marks omitted). A substantial contacts inquiry—in which we examine the offense's contacts with the forum district— "offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial." *Id.* at 93. And the special circumstances of venue as applied to an aider and abettor, in which the aider and abettor's own contacts with a forum district may recede in importance to those of the primary actor, adds a layer of complexity to the inquiry.

But Kenneth does not renew on appeal the argument that he made below, in his pre-trial motion to dismiss, that the offense with which he is charged lacks substantial contacts with Vermont. To the extent that this argument may not be waived, or a substantial contacts analysis is required when venue is laid pursuant to § 3238, we discern several sources of constitutional comfort for our ruling in this matter: that Lisa and Janet sought civil union status under Vermont law; that they sought the refuge and adjudication of the Vermont

courts; that IMJ's removal directly affected ongoing custody proceedings in Vermont courts and Janet's Vermont-rooted parental rights; and that the Virginia courts, before Kenneth and Lisa acted, recognized the priority that federal law ascribed to Vermont courts in adjudicating Lisa and Janet's—and IMJ's—rights. The international parental kidnapping that Kenneth was found to have aided and abetted thus had many, and substantial, connections with the Green Mountain State. These observations also suggest that the strong interest in the dispute maintained by Vermont, as the home of Janet and the courts vested with relevant authority, and the possibility of some form of legal proceedings there, were foreseeable to Kenneth.

We note, too, that at no time did Kenneth seek to transfer venue out of Vermont, and, for example, to the Western District of Virginia, where he and Lisa both formerly resided. Pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, he might have done so. *See* Fed. R. Crim. P. 21(b) (providing for transfer of venue "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice"). In any event, it seems likely that there was little significant or unforeseeable hardship for Kenneth who, after all, had been living in Ireland for over a year by the time of trial. Indeed, the government

points out that "[o]f the 20 witnesses called by the government in its case-in-chief, four were from Vermont and four were from Virginia. The remaining 12 ranged from Washington state, Kansas, and Tennessee, to Canada and Nicaragua. Of the two witnesses called by the defense, 1 was from Virginia and 1 was from Kansas." Appellee's Br. at 30 n.7. We have been provided no basis for concluding that Kenneth was prejudiced in his defense by being subjected to prosecution in the District of Vermont.

Kenneth's arguments that the government has more typically relied on § 3237 instead of § 3238 do not persuade us that § 3238 is unavailable to support venue for his crime. As the government notes, many of the cases listed by Kenneth arose in very different circumstances: an unsuccessful attempt, for example, to conduct an international parental kidnapping, with the absconding parent him- or herself arrested at an airport, which subsequently provided the basis for venue. Nor does the specter drawn by Kenneth of a decision supporting the use of § 3238 as unraveling many previously concluded prosecutions convince us that our conclusion is erroneous. Our reasoning does not necessarily affect convictions in which venue has been laid under § 3237.

**CONCLUSION**

We conclude that venue for the prosecution of Kenneth Miller on charges of aiding and abetting Lisa Miller in the removal of a child from the United States, in violation of 18 U.S.C. §§ 1204 and 2, properly lay in the District of Vermont, his place of arrest, pursuant to 18 U.S.C. § 3238. The conduct comprising the crime of removal of a child from the United States in violation of the International Parental Kidnapping Crime Act occurred in its essence outside the United States such that § 3238 provides a basis for laying venue in the district of arrest. We do not foreclose that, in an appropriate case, venue might also be set under § 3237; we express no opinion about that statute's applicability.

The judgment of the District Court is **AFFIRMED**.