**UNITED STATES of America**

v.

**Philip ZODHIATES, Defendant.**

**14-CR-175-A**

United States District Court,
W.D. New York.

Signed 01/20/2016

Kathleen Ann Lynch, United States Attorney's Office, Buffalo, NY, for Plaintiff.

## DECISION AND ORDER

HON. RICHARD J. ARCARA,
UNITED STATES DISTRICT JUDGE

Philip Zodhiates has been charged in a two-count superseding indictment with (1) conspiring to violate the International Parental Kidnapping Crime Act (IPKCA) and (2) aiding and abetting a violation of the IPKCA. The Government alleges that Zodhiates and his co-defendants removed a child from the United States and that they did so with the intent to obstruct the lawful exercise of the parental rights of one of the child's parents.

The Court referred this case to Magistrate Judge McCarthy for all pre-trial matters. Zodhiates then filed motions to:

(1) suppress location information found in cell phone billing records, which the Government obtained via grand jury subpoena;

(2) suppress evidence acquired by a federal grand jury in the District of Vermont, which investigated a case that relates to this one;

(3) suppress evidence obtained by the Government from a civil lawsuit, brought by a private party, that parallels this one;

(4) dismiss Count II of the superseding indictment and part of Count I of the superseding indictment;

(5) dismiss the superseding indictment based on the Government's alleged cumulative misconduct; and

(6) confirm the scope of "previous court orders."

Magistrate Judge McCarthy filed a report and recommendation that recommended denying motions one, three, four and five. Magistrate Judge McCarthy also recommended denying, without prejudice, Zodhiates' motion to suppress the Vermont grand jury evidence.[1] Finally, Magistrate Judge McCarthy recommended denying Zodhiates' last motion without prejudice to renewal before this Court.

For the reasons discussed below, the Court adopts the report and recommendation and denies each of Zodhiates' motions, other than his motion to "confirm the scope of previous court orders." That motion is effectively a request that the Court rule on a jury instruction and, therefore, is premature. Zodhiates may, however, renew the motion closer to trial.

## BACKGROUND

This case has its roots in a series of family law disputes in the Vermont and Virginia state courts that resulted in a criminal prosecution in the U.S. District Court for the District of Vermont. Those proceedings form the backdrop of this case. They are also relevant to several of the issues raised in Zodhiates' motions. Accordingly, the Court briefly discusses them below.[2]

After living together in Virginia for several years, Lisa Miller and Janet Jenkins entered into a civil union in Vermont in 2000.[3] *Miller–Jenkins v. Miller–Jenkins*, 180 Vt. 441, 912 A.2d 951, 956 (2006). In 2002, Lisa gave birth to a daughter, IMJ,[4] who was conceived via artificial insemination. *Id.* The couple and their daughter lived in Virginia for several more months before moving to Vermont in August 2002. Just over one year later, Lisa and Janet

---

1. Magistrate Judge McCarthy recommended denying this motion without prejudice because he concluded that that the Second Circuit's decision in *United States v. Miller*, which had not yet been released, might have relevance to the issues raised in Zodhiates' motion. The Second Circuit's decision was issued shortly after Magistrate Judge McCarthy issued his report and recommendation. *See United States v. Miller*, 808 F.3d 607 (2d Cir.2015).

2. The facts that follow are drawn from the superseding indictment in this case and the various state court orders and decisions underlying the Government's allegations.

3. Two of the defendants in this case, as well as the defendant in the related criminal action in Vermont, have the surname "Miller." None are related. The Court refers to each by his or her first name to avoid confusion. Likewise, because Lisa Miller and Janet Jenkins shared the same last name during the time of their civil union, the Court refers to each by her first name.

4. The filings in this case refer to Lisa and Janet's daughter as "IMJ," "J1," and by her actual name. For simplicity, the Court refers to her as IMJ.

separated, and Lisa returned to Virginia with IMJ.

In November 2003, Lisa petitioned a Vermont family court to dissolve her and Janet's civil union. That court issued a temporary restraining order awarding Lisa temporary legal and physical responsibility for IMJ and assigning Janet the right to visit IMJ and speak with her on a daily basis. *Id.* Shortly thereafter, Lisa began denying Janet the visitation and contact rights ordered by the Vermont family court. Lisa then filed a petition in Virginia state court asking that court to establish IMJ's parentage. *Id.*

The result was "an interstate parental-rights contest," as both Vermont and Virginia state courts asserted jurisdiction to determine parental rights over IMJ. *Id.* at 956–57. Ultimately, the Virginia Court of Appeals held that the state courts of Vermont, and not those of Virginia, had jurisdiction over the matter and ordered Virginia courts to "grant full faith and credit to the custody and visitation orders of the Vermont court." *Miller–Jenkins v. Miller–Jenkins*, 49 Va.App. 88, 637 S.E.2d 330, 332 (2006).

In the meantime, the Vermont family court found Lisa in contempt, found that both Lisa and Janet had parental interests in IMJ, and set the case for a final hearing. *Miller–Jenkins*, 912 A.2d at 957. After a trial, the Vermont family court, in a decision later affirmed by the Vermont Supreme Court, "ordered sole physical and legal custody of IMJ go to Lisa, subject to Janet's visitation rights." *Miller–Jenkins v. Miller–Jenkins*, 189 Vt. 518, 12 A.3d 768, 772 (2010). The Vermont family court also "warned Lisa that continued interference with the relationship between IMJ and Janet could lead to a change in circumstances warranting a modification of custody." *Id.*

Following that order, the Vermont family court found Lisa in contempt seven times for violating parent-child contact orders. *Id.* In January 2009, the Vermont family court "again explicitly warned Lisa that continued failure to comply with court-ordered visits could lead to a transfer of custody to Janet." *Id.*

Janet then filed two motions to transfer custody of IMJ to herself. The first was motion denied. A hearing on the second, which Lisa did not attend, was held in August 2009. *Id.* In November 2009, the Vermont family court "concluded that Lisa's willful interference with Janet's visitation rights amounted to a real, substantial, and unanticipated change in circumstances." *Id.* The court accordingly awarded Janet sole physical and legal custody of IMJ. *Id.*

Those proceedings set the stage for the Government's allegations in this case. The Government alleges that on or about September 21, 2009—after the hearing on Janet's second motion to transfer custody, but before the Vermont family court awarded Janet sole physical and legal custody—Lisa, IMJ, and Zodhiates travelled from Virginia to Buffalo. Docket 41 (Superseding Indictment) at 2. The Government alleges that while he was in Buffalo, Zodhiates spoke by phone with Kenneth Miller, as well as "an individual in Canada who had agreed to help transport" Lisa into Canada. *Id.*

The next day, the Government alleges, Lisa and IMJ crossed the Rainbow Bridge from Niagara Falls, New York into Canada. That same day, the Government alleges Zodhiates again had telephone contact with both Kenneth and the individual in Canada who had helped Lisa and IMJ cross the border. *Id.*

Slightly more than two years after Lisa left the country with IMJ, Kenneth was indicted in the District of Vermont on a one-count indictment charging him with aiding and abetting Lisa's alleged violation

of the International Parental Kidnapping Crime Act (IPKCA). After a jury trial, Kenneth was found guilty of aiding and abetting Lisa's removal of IMJ from the United States. The Second Circuit has since affirmed Kenneth's conviction over his challenge to the Government's decision to lay venue against him in the District of Vermont. *See United States v. Miller*, 808 F.3d 607 (2d Cir.2015).

This case followed Kenneth's. Zodhiates, Lisa Miller, and Timothy Miller are each charged in a two-count superseding indictment with (1) conspiring to violate the IPKCA, and (2) violating, or aiding and abetting a violation of, the IPKCA.[5] The relevant provision of the IPKCA makes it a crime to "remove[ ] a child from the United States, or attempt[ ] to do so, or retain[ ] a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a).

## DISCUSSION

As noted, Zodhiates has moved to suppress various types of evidence, has moved to dismiss parts of the superseding indictment, and has moved for several other forms of relief. The Court addresses each motion in turn.

1. **Motion to suppress location information obtained by grand jury subpoena**

Zodhiates first moves to suppress location information found in the billing records for several cell phones used by Zodhiates and his family.[6] During the Government's investigation of Kenneth Miller in the District of Vermont, two grand jury subpoenas were issued to nTelos Wireless. *See* Docket 18-2. The subpoenas requested a variety of information for two different cell phone numbers over a period of approximately 28 months. *Id.* Specifically, the subpoenas requested, among other things:

- "All subscriber information," such as "account number," "subscriber name," and "other identifying information";
- "Means and source of payments";
- "[L]ength of service";
- "Detail records of phone calls made and received (including local and incoming call records if a cellular account) and name of long distance carrier if not [nTelos]";
- "Numeric (non-content) detail records of text messages (including SMS), multimedia (including MMS), and other data transmissions made and received (including any IP address assigned for each session or connection)."

*See, e.g.,* Docket 18-2 at 5. The subpoenas did not request the contents of phone calls or text messages, nor did they specifically request information concerning the locations from which phone calls were made or received.

In response to the subpoenas, nTelos produced billing records that show some-

---

**5.** Lisa Miller and Timothy Miller are both currently fugitives.

**6.** The subscriber for each cell phone is not Zodhiates, but is Response Unlimited, Inc., a company of which Zodhiates is the president and sole shareholder. Docket 36-1 ¶ 2. Nonetheless, the phones "are exclusively used by Mr. Zodhiates, his wife, and one of his sons," and Response Unlimited considers the phones to be "Mr. Zodhiates' personal

phones." *Id.* ¶ 5. In its briefing before Magistrate Judge McCarthy, the Government argued that Zodhiates lacks standing under the Fourth Amendment to seek suppression of the cell phone records at issue because Zodhiates does not himself subscribe to the phones. Magistrate Judge McCarthy rejected that challenge, and the Government has not renewed it before this Court. The Court finds no fault with Magistrate Judge McCarthy's conclusion and therefore adopts it.

what detailed call information. Specifically, the records show the date and time of phone calls made from or received by the subject cell phones, together with the "Service Location" from which each call was made or received. For example, the "Roam Activity" for one of the cell phones shows that, over a two-day period in September 2009, the cell phone made or received calls while it was located in "Altoona PA," "Pittsburgh PA," "Buffalo—RO NY," and "Harrisburg PA."[7] The "Roam Activity" for another of the cell phones similarly shows numerous calls made or received by a phone located, over a three-day period, in "Hagerstown MD," "Altoona PA," "Pittsburgh PA," "Meadville PA," "Cambdg Spg PA," and "Buffalo NY." Docket 18–4 at 29. Further, several entries in the billing records show multiple calls made or received from the same Service Location at different times and on different dates. The entry for each of these calls also shows the number to which the call was made or from which the call was received, the location called, and the duration of the call. *Id.*[8]

At Kenneth Miller's trial in the District of Vermont, the Government used the location, time, and date information from the nTelos billing records to show the movement of one of the cell phones from Virginia, through Maryland and Pennsylvania, and ultimately to Buffalo over the course of several days in September 2009. *See* Docket 18–3 & 18–5.

Zodhiates has moved to suppress this location information because, he argues, he had a "reasonable expectation of privacy in the 'Service Location' data aggregated by the Government." Docket 70 at 11. Put another way, Zodhiates contends that he has a reasonable expectation of privacy in his movements from one place to another over a period of time. From this premise, Zodhiates argues that the Government conducted a Fourth Amendment "search" when it obtained the billing records. And because the Government conducted a "search," Zodhiates argues, it could obtain the location information only with a warrant, and not simply with a grand jury subpoena.

However, before reaching this constitutional issue, the Court first addresses whether, as Zodhiates argues, the Government lacked the statutory authority to use a grand jury subpoena to obtain the nTelos billing records. The Government stated at oral argument that it subpoenaed the nTelos billing records pursuant to 18 U.S.C. § 2703(c)(2), a provision of the Stored Communications Act (SCA) authorizing the Government to obtain, via grand jury subpoena, among other things, a subscriber's name; address; "local and long distance telephone connection records, or records of session times and durations"; and "length of service . . . and types of service utilized." *See* Tr. of Dec. 21, 2015 Oral Argument at 20 (identifying § 2703(c)(2)(C) as the basis for the subpoenas).

Zodhiates argues that the location information included on the nTelos billing rec-

**7.** The Court presents these example Service Locations exactly as they appear in the exhibit provided to the Court. *See* Docket 18–4 at 16.

**8.** In proceedings before Magistrate Judge McCarthy, an nTelos custodian of records submitted an affidavit stating that when nTelos received the subpoenas at issue, it "only provided basic information about the subscriber, including name, address, and type of account" and that it did "not [provide] all information about the account." Docket 35–1 ¶ 2. The custodian further stated that she was "familiar with requests for subscriber information, and [she] always interprets such requests in a similar way." *Id.* According to the custodian, "nTelos would not provide call detail records or cell site records in response to a subpoena request for subscriber information." *Id.*

ords is not among the information § 2703(c)(2) authorizes the Government to obtain by subpoena. Zodhiates claims that the Government may gather location information only by, among other means, obtaining a warrant. *See* 18 U.S.C. § 2703(c)(1) (requiring the government to obtain, among other things, a warrant in order to acquire "a record or other information pertaining to a subscriber" that is not listed in § 2703(c)(2)). The Government counters that the location information contained in the billing records is exactly what § 2703(c)(2)(C) authorizes it to obtain by subpoena: "local and long distance telephone connection records."

The Court, however, need not resolve whether the location information contained in the nTelos billing records is information the Government can obtain with just a subpoena. Even if it were (a question on which the Court offers no opinion), the issue is meaningless in this case because "suppression of evidence is not a remedy for alleged violations of the [SCA]." *United States v. Stegemann,* 40 F.Supp.3d 249, 271 (N.D.N.Y.2014) (internal quotation marks omitted). The SCA provides that its "remedies and sanctions"—which include administrative discipline and a civil suit against parties other than the United States, but *not* suppression—"are the only judicial remedies and sanctions for nonconstitutional violations" of the SCA. 18 U.S.C. § 2708. *See also* 18 U.S.C. § 2707 (remedies available under the SCA). Zodhiates' SCA arguments are therefore irrelevant to the relief he seeks.

■■■■ If Zodhiates is to successfully suppress the location information in the nTelos billing records, he must therefore show that the Government obtained the information in violation of the Fourth Amendment. The Fourth Amendment, of course, prohibits "unreasonable searches and seizures." Thus, to make a Fourth Amendment claim, Zodhiates must show

that the Government conducted a "search" when it obtained aggregated location information for his cell phones.

■■■■ "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States,* 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Thus, to claim Fourth Amendment protection, an individual must affirmatively answer "two separate questions": first, that he had "a subjective desire to keep his or her effects private"; and second, that his subjective expectation of privacy is "one that society accepts as reasonable." *United States v. Paulino,* 850 F.2d 93, 97 (2d Cir.1988). It follows from this test that "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■■■■ Consequently, the Supreme Court has identified what has come to be known as the "third-party doctrine," which provides that the "Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities." *United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). In other words, revealing certain information to a third-party undercuts any expectation of privacy in that information, "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.*

For instance, in *United States v. Miller,* the Supreme Court held that the government was permitted to obtain the defendant's bank records with a subpoena, rather than a warrant, because the records were not the defendant's "private papers." *Id.* at 440, 96 S.Ct. 1619. The bank rec-

ords were instead "business records of the banks .... pertain[ing] to transactions to which the bank was itself a party." *Id.* at 440–41, 96 S.Ct. 1619 (internal quotation marks and citations omitted). Moreover, the defendant had "no legitimate expectation of privacy" in the contents of his checks and deposit slips because those documents "contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442, 96 S.Ct. 1619.

Three years after *Miller,* in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Court reaffirmed the third-party doctrine in a case that bears a passing factual resemblance to this one. In *Smith,* the Court held that the government did not conduct a Fourth Amendment "search" by using a pen register to record the telephone numbers the defendant dialed. As in *Miller,* the Court concluded that the defendant did not have a "legitimate expectation of privacy" in phone numbers he conveyed to a third party, such as the phone company. According to the Court, "[t]elephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes," such as, the Court noted, compiling billing records. *Id.* at 742–43, 99 S.Ct. 2577. As a result, it was "too much to believe that telephone subscrib-ers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret." *Id.* Thus, no Fourth Amendment "search" occurred, even if the defendant otherwise demonstrated his subjective expectation of privacy by dialing phone numbers from his home. *Id.* at 743, 99 S.Ct. 2577.

■ *Miller* and *Smith* are reasonably interpreted to stand for the proposition that "individuals have no reasonable expectation of privacy in certain business records owned and maintained by a third-party business." *United States v. Davis,* 785 F.3d 498, 507 (11th Cir.2015) (en banc). That interpretation easily applies to the cell phone location information at issue in this case. Just as the defendant in *Smith*· had to transmit a phone number to his phone company in order to place a call, "[cell] [u]sers are aware that cell phones do not work when they are outside the range of the provider company's cell tower network." *Id.* at 511. As a result, a cell phone user cannot reasonably expect that his carrier does not collect and maintain non-content call information such as the location from which he makes or receives a call. Rather, it is "common knowledge that communications companies regularly collect and maintain all types of non-content information regarding cell-phone communications . . . for cell phones for which they provide service." *In re Application of the U.S.A. for an Order Pursuant to 18 U.S.C. 2703(c) and 2703(d),* 42 F.Supp.3d 511, 517 (S.D.N.Y.2014).[9] The phone sim-

---

9. Several of the cases cited in this section of the Court's opinion involve the government obtaining historical cell-site location information (CSLI) without a warrant. "Historical CSLI identifies cell sites . . . to and from which a cell phone has sent or received radio signals, and the particular points in time at which these transmissions occurred, over a given timeframe." *United States v. Graham,* 796 F.3d 332, 343 (4th Cir.2015). That data can then "be used to interpolate the path the cell phone, and the person carrying the phone, travelled during a given time period." *Id.* Historical CSLI data is not what is at issue in this case, but as both parties acknowledge, the legal issues are generally the same. The Court, however, expresses no opinion on the constitutionality of warrantless CSLI collection.

ply would not work otherwise. Moreover, attributing this "common knowledge" to cell phone users is even more reasonable where, as in this case, the location information was not collected solely for the purpose of routing calls, but also to determine whether the cell phone was "roaming."[10] A cell phone user cannot reasonably expect that his carrier will charge him for making and receiving calls while roaming if the carrier has no way of determining the location from which the subscriber is making or receiving calls.

In short, it is "too much," *Smith,* 442 U.S. at 743, 99 S.Ct. 2577, to conclude that Zodhiates, or any cell phone subscriber, "labor[s] under the belief that their location is somehow kept secret from telecommunication carriers and other third parties." *In re Smartphone Geolocation Data Application,* 977 F.Supp.2d 129 (E.D.N.Y.2013). It follows, under *Miller* and *Smith,* that there is no reasonable expectation of privacy in the cell phone location information at issue in this case. No Fourth Amendment "search" occurred, and the Government thus did not need to obtain a warrant to gather the location information in the nTelos billing records.

Zodhiates' principle response to this conclusion relies on the Supreme Court's recent decision in *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). In *Jones,* government agents placed a GPS tracking device on the defendant's car and then used the device to track the vehicle's movements for 28 days. *Id.* at 948. All nine Justices agreed that the government's conduct constituted a Fourth Amendment "search," but the Justices reached that conclusion for a number of reasons. Five Justices joined an opinion which concluded that the government committed a trespass—and, thus, conducted a "search"—by "physically occup[ying] private property for the purpose of obtaining information." *Id.* at 949. That is, simply attaching the device to the defendant's car was itself a "search."

Justice Sotomayor joined the majority's opinion, but she also separately concurred to question "whether people reasonably expect that their movements will [through GPS] be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on." *Id.* at 956 (Sotomayor, J., concur-

---

**10.** Before Magistrate Judge McCarthy, a Response Unlimited employee submitted an affidavit stating, in effect, that no one at Response Unlimited would have seen this location information. *See* Docket 36–1 ¶ 6 ("Since February 2009, nTelos has not sent [Response Unlimited] any paper bills for the Wireless Service. [Response Unlimited] staff accesses the account and pays the bills on line. Bills are not downloaded, printed, or saved. They are just paid.... A sample of the on line nTelos bill [attached to the affidavit] .... shows only the telephone number of the particular phone, the charges to that number, and the total due.") An nTelos representative confirmed that Response Unlimited "received monthly statements not monthly detailed bills" and that the former "do not list call detail information." Docket 35–1 ¶ 3. However, the detailed billing records received by the Government "were available for review ... by Response Unlimited." *Id. See also id.* ("nTelos customers, such as Response Unlimited, also have the ability to review the monthly detailed bill on line.") Regardless of whether all of this is accurate, it is irrelevant to the Court's Fourth Amendment analysis. Even if Zodhiates evidenced a subjective expectation of privacy in his location information by not receiving or viewing location information from nTelos (an assumption open to some question), that is not the end of the analysis. As noted, no reasonable cell phone subscriber could believe that his cell phone carrier does *not* collect location information. Thus, even if Zodhiates demonstrated a subjective expectation of privacy in his location information, he had no objective expectation of privacy in such information.

ring). Even more pertinent to this case, Justice Sotomayor called into question the third-party doctrine, arguing that it "is ill suited to the digital age." *Id.* at 957. Justice Sotomayor concluded, however, that "[r]esolution of these difficult questions ... is unnecessary ... because the Government's physical intrusion on [the defendant's] Jeep supplies a narrower basis for decision." *Id.*

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, issued a separate concurrence. Justice Alito criticized the Court's trespass approach to the Fourth Amendment issue and argued that the Court should, consistent with *Katz v. United States,* "ask[ ] whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." *Id.* at 958 (Alito, J., concurring in the judgment). Justice Alito concluded that "the use of longer term GPS monitoring in investigations of most offenses impinges on privacy" and that "society's expectation has been that law enforcement agents and others would not ... secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 964.

Zodhiates' argument combines these two concurrences to claim that "five justices agreed that when the Government engages in prolonged location tracking, in conducts a search under the Fourth Amendment." Docket 70 at 8. This argument has some superficial appeal. However, it is ultimately without merit, as Zodhiates cannot reconcile his interpretation of the *Jones* concurrences with the third-party doctrine.

In short, Zodhiates asks for too much on the basis of too little. If the Supreme Court had intended to reach that conclusion, surely five Justices would have said so explicitly. Instead, the far narrower basis for the Court's decision—and the only one expressly agreed to by five Jus-

tices—is Justice Scalia's trespass theory. *Cf. Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted). Justice Scalia's opinion clearly did not address the continuing validity of the third-party doctrine.

Neither did Justice Alito's concurrence, on which Zodhiates bases much of his argument. If Justice Alito's concurrence were to be read to prohibit what the Government did in this case, it would, at the very least, need to be reconciled with the third-party doctrine. But as the Eleventh Circuit observed when rejecting an argument nearly identical to Zodhiates', "[i]t would be a profound change in jurisprudence to say Justice Alito was questioning, much less casting aside, the third-party doctrine without even mentioning the doctrine." *Id.* The result is that the *Jones* concurrences "leave the third-party doctrine untouched and do not help [Zodhiates'] case." *Davis,* 785 F.3d at 514.

Zodhiates' second argument is based on the Second Circuit's recent decisions in *ACLU v. Clapper,* 785 F.3d 787 (2d Cir. 2015) (*Clapper I* ) and 804 F.3d 617, 625 (2d Cir.2015) (*Clapper II* ). *Clapper I* concluded that a provision of the USA PATRIOT Act did not authorize the National Security Agency's since-curtailed bulk telephone metadata collection program. 785 F.3d at 821. After reaching this statutory conclusion, the Second Circuit went on to "discuss ... some of the Fourth Amendment concerns that the [metadata collection] program implicates." *Id.* at 821 n. 12. The court surveyed the case law discussed above and acknowledged that the constitutional questions "present[ ] po-

tentially vexing issues." *Id.* at 821. However, given its statutory holding, the court declined to address those constitutional issues. *See id.* at 824–25. *See also id.* at 826 ("We reiterate that, just as we do not here address the constitutionality of the program as it currently exists, we do not purport to express any view on the constitutionality of any alternative version of the program.") *Clapper I* 's discussion of the constitutional questions at issue here was thus unquestionably dicta.

*Clapper II* provides no more guidance than *Clapper I* does. *Clapper II* involved an attempt to enjoin the NSA's metadata collection program prior to the program's termination date, which Congress had implemented in the wake of *Clapper I*. As in *Clapper I*, the Second Circuit acknowledged that the constitutional issues in the case "invoke[d] one of the most difficult issues of modern jurisprudence," and one "on which the Supreme Court's jurisprudence is in some turmoil." *ACLU v. Clapper*, 804 F.3d 617, 625 (2d Cir.2015) (internal quotation marks omitted). But again, the Second Circuit declined to "decide today the relationship between changing expectations of privacy and third-party providers." *Id.* at n. 4.

The *Clapper* cases therefore provide little meaningful guidance (and certainly none that is binding) for this case. The Second Circuit has not otherwise addressed the issue raised by Zodhiates in any detail. The Second Circuit has, however, provided some help. In *United States v. Pascual*, an unpublished decision, the court found no plain error in a district court's decision to admit cell-site records obtained without a warrant. The Second Circuit held that the defendant's argument to the contrary was "(at the very least) in some tension with prevailing case law"— specifically, *Miller* and *Smith*—which established "principles . . . point[ing] the other way." *United States v. Pascual*, 502 Fed.Appx. 75, 80 & n. 6 (2d Cir.2012).

Admittedly, *Pascual* says little other than that *Miller* and *Smith* continue to be binding law. But absent Supreme Court intervention or a contrary decision (and not dicta) from the Second Circuit, *Pascual* "reflects the Second Circuit's probable approach" to the issues in this case. *United States v. Caraballo*, 963 F.Supp.2d 341, 359 (D.Vt.2013). *See also In re Application of the U.S.A.*, 42 F.Supp.3d at 517 (observing that "*Smith* and *Miller* remain the 'prevailing case law' ") (citing *Pascual*, 502 Fed.Appx. at 80). Thus, *Miller* and *Smith* preclude any finding that the Government conducted a Fourth Amendment "search" in this case when it obtained cell phone location information.

The Court bases this holding on two other considerations. First, it is consistent with those of several courts of appeals that have addressed similar (if not identical) issues.[11] Second, Zodhiates seeks a

---

11. *See, e.g., United States v. Davis*, 785 F.3d 498, 511 (11th Cir.2015) (*en banc* ) ("[C]ell users must know that they must transmit signals to cell towers within range, that the cell tower functions as the equipment that connects the calls, that users when making or receiving calls are necessarily conveying or exposing to their service provider their general location within that cell tower's range, and that cell phone companies make records of cell-tower usage."); *In re Historical Cell Site Data*, 724 F.3d 600, 613 (5th Cir.2013) ("Cell phone users, therefore, understand that their service providers record their location information when they use their phones at least to the same extent that the landline users in *Smith* understood that the phone company recorded the numbers they dialed."). *But see United States v. Graham*, 796 F.3d 332, 345 (4th Cir.2015) (holding that "[c]ell phone user have an objectively reasonable expectation of privacy" in "the movements of the cell phone and its user across public and private spaces" obtained by "inspect[ing] a cell phone user's historical [cell site location information] for an extended period of time"). The Fourth Circuit has since agreed to rehear *Graham en banc*. *See* 624 Fed.Appx. 75 (4th Cir.2015).

ruling that would call into question the constitutionality of common investigative tools that have otherwise been thought to stand on constitutionally firm ground. The Government "routinely issues subpoenas to third parties to produce a wide variety of business records, such as credit card statements, bank statements, hotel bills, purchase orders, and billing invoices"—all documents that "not only show location at the time of purchase, but also reveal intimate details of daily life, such as shopping habits, medical visits, and travel plans." *Davis*, 785 F.3d at 506 & n. 9.

Many of these records undoubtedly reveal an individual's location to a degree that is much more precise than the location information in this case. A credit card bill, for instance, might show that an individual made purchases at several stores (and not just, as the billing records here show, in particular cities) over the course of a day. To say the least, it would be consequential to conclude that the Government has conducted a Fourth Amendment "search" when it subpoenas such records.

At bottom, the nTelos billing records are routine business records that reveal nothing protected by the Fourth Amendment. Thus, the Government did not conduct a Fourth Amendment "search" when it obtained the location information in those records. As a result, Zodhiates' motion to suppress that information is denied.[12]

### 2. Motion to suppress evidence obtained by a federal grand jury in the District of Vermont

■ As discussed above, this case is related to the investigation and prosecution of Kenneth Miller in the District of Vermont. Zodhiates has moved to suppress "evidence gathered by [the] Vermont

grand jury" that investigated that case. Docket 70 at 14. According to Zodhiates, the Government "unconstitutionally community forum-shopped by declining to pursue grand jury proceedings in the Western District of Virginia," where, at the time, same-sex marriage was banned by state constitutional amendment, "in favor of the District of Vermont," where same-sex marriage was legal. *Id.*

The crux of Zodhiates' argument is that he "had the right to a grand jury drawn from a vicinage where a crime was committed." Docket 70 at 17. Zodhiates goes on to argue that "[t]he grand jury convened in the District of Vermont exceeded its jurisdiction by investigating alleged crimes outside Vermont." *Id.* Accordingly, Zodhiates argues that to use evidence acquired by the Vermont federal grand jury in this case would violate his Article III right to trial "in the State where the ... Crimes shall have been committed" (Art. III, § 2, cl. 3), as well as his Sixth Amendment right to trial "by an impartial jury of the State and district wherein the crime shall have been committed."

■ Zodhiates' argument is novel and worth some discussion. The grand jury is "an appendage or agency of the court" and may therefore "investigate any crime that is within the jurisdiction of the court." *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir.1983). But it does not follow that a grand jury's investigative powers are limited to the geographic boundaries of the district court to which it is attached; the grand jury's "duty to inquire cannot be limited to conduct occurring in the district in which it sits." *Id.* This is so for two reasons.

---

12. Because the Court concludes that no Fourth Amendment "search" occurred in this case, the Court does not reach the good faith exception issue on which Magistrate Judge McCarthy decided Zodhiates' motion.

The first takes Zodhiates' argument on its own terms. The question, as Zodhiates has posed it, is whether "the district of Vermont, and therefore the Vermont grand jury, did [or did not] have jurisdiction" to investigate crimes allegedly committed by Zodhiates in the District of Vermont, the Western District of Virginia, the Western District of New York, or elsewhere. Docket 70 at 19. The answer is simple: of course it did.

Congress has invested "[t]he district courts of the United States" with "original jurisdiction ... of *all offenses* against the laws of the United States." 18 U.S.C. § 3231 (emphasis added). Section 3231 therefore provided the U.S. District Court for the District of Vermont with subject matter jurisdiction over this case's Vermont companion. "That's the beginning and the end of the jurisdictional inquiry." *United States v. Tony,* 637 F.3d 1153, 1158 (10th Cir.2011). *See also United States v. Williams,* 341 U.S. 58, 66, 71 S.Ct. 595, 95 L.Ed. 747 (1951). And, as noted above, a federal grand jury has the authority to "investigate any crime that is within the jurisdiction of the court" to which the grand jury is attached. *Marc Rich & Co., A.G.,* 707 F.2d at 667.

Putting these two principles together, the Vermont federal grand jury had jurisdiction to investigate Zodhiates' alleged commission of a federal crime, regardless of whether the conduct constituting that crime occurred in Virginia, Vermont, New York, or elsewhere. It is simply irrelevant whether, as Zodhiates argues, "the Government has no evidence that [he] committed a crime in Vermont." Docket 70 at 14. Assuming the truth of that statement, a federal grand jury impaneled in Vermont was entitled to acquire evidence simply "because it want[ed] assurance that" the "law [wa]s not ... violated" in Vermont. *United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

■ The second reason for the Court's conclusion is based on a practical analysis of the grand jury's investigative function. "A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *Branzburg v. Hayes,* 408 U.S. 665, 701, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (internal quotation marks omitted). It is a "necessary consequence" of this broad investigative power that the "grand jury paints with a broad brush." *United States v. R. Enterprises, Inc.,* 498 U.S. 292, 297, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

Thus, in light of the "awesome power of the government to use the inquisitional function of the grand jury," *United States v. Davis,* 702 F.2d 418, 421 (2d Cir.1983), it is unsurprising that Zodhiates cites no authority that supports limiting a grand jury's investigative powers to a district court's territorial bounds. Little would be left of the federal grand jury's investigative powers if the rule were otherwise. "[T]he nature of the crime and the identity of the accused are decisions made by the grand jury at the conclusion of its inquiry, not at the beginning." *Id.* at 422. Given this reality, as well as the fact that many federal crimes are federal crimes *because* they involve multiple jurisdictions, Zodhiates' proposed rule makes no practical sense and would lead to absurd results. To take one of many examples, surely a grand jury impaneled in the Southern District of New York could, as part of its investigation of potential criminal conduct in that district, investigate conduct that took place across the river in the District of New Jersey. Zodhiates offers no authority that states, and no reason to think, that that should not be the case. In addi-

tion to these practical considerations, Zodhiates' proposed rule would be contrary to the grand jury's historically broad investigative authority. *See Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919) (noting that the grand jury is a "body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable results of the investigation"). This is presumably why the little case law on this issue points in the other direction.[13]

The issue underlying Zodhiates' grand jury argument appears to really be one of venue—as the Government notes, "[h]e appears to view jurisdiction and venue as equivalent." Docket 72 at 24. *See also* Docket 70 (Zodhiates' Br.) at 17 ("The Government's forum shopping was unconstitutional because Mr. Zodhiates had the right to a grand jury drawn from a vicinage where a crime was committed.") But Zodhiates cites no authority for the proposition that he has a right to be *investigated* by a grand jury that has been impaneled in a manner consistent with the federal venue statutes.

Instead, the fairness concerns that Zodhiates raises as the basis for his grand jury argument are addressed by rules governing the venue where the Government chooses to bring its case. As the Second Circuit noted in its decision affirming Kenneth Miller's conviction against a venue challenge, concerns about "trial in an environment alien to the accused" are solved by identifying the proper venue for a case. *United States v. Miller,* 808 F.3d 607, 614–15 (2d Cir.2015); *see also id.* ("Constitu-

tionally mandating that a trial be held in the state where the wrong was committed ... worked to alleviate these concerns.") Thus, the refuge Zodhiates seeks in "a friendlier forum" (Zodhiates Br. 17) is guaranteed by venue rules. Zodhiates, however, has not challenged whether venue is proper in this district. His motion to suppress evidence obtained by the Vermont grand jury is therefore denied.

### 3. Motion to suppress evidence obtained by, or resulting from, civil discovery

■ Zodhiates next moves to suppress evidence obtained by the Government as a result of a civil suit filed by Lisa Miller's former partner, Janet Jenkins. In August 2012, Jenkins filed a complaint in the U.S. District Court for the District of Vermont against, among others, Zodhiates, Lisa Miller, and Kenneth Miller. Jenkins asserts various state law tort claims, federal civil rights claims, and civil claims for violations of the Racketeer Influenced and Corrupt Organizations Act. *See* Docket 59 (Amended Complaint) in 2:12–cv–00184–wks (D.Vt.).

The Government states that it "only very generally followed the course of the civil litigation" in Vermont. Docket 52 at 5. However, the Government acknowledges that Jenkins' counsel in her civil suit provided the Government with discovery materials produced by Zodhiates' business, Response Unlimited. Docket 52 at 6. The Government states that when Response Unlimited requested that Jenkins' counsel agree to a protective order (after it pro-

---

**13.** *See, e.g., LaRocca v. United States,* 337 F.2d 39, 43 (8th Cir.1964) ("There is no question that when the grand jury is investigating a possible federal offense within its jurisdiction, it is authorized to receive evidence as to any acts related to the offense even though they occurred outside its jurisdiction."); *In re Grand Jury Proceedings,* 579 F.2d 1135, 1136 (9th Cir.1978) (summarily concluding that a nearly identical argument "does not have merit" where "[t]here is no substantial evidence that the grand jury is performing other than its prescribed function of investigating possible crimes committed within its jurisdiction").

duced the materials to Jenkins), "the prosecutors immediately suspected that there must be documents of value held by Response Unlimited" and "immediately issued a grand jury subpoena to Response Unlimited." *Id.* Jenkins' attorneys have asserted, through their briefing in the Vermont civil case, that "[t]he Government has had absolutely no input on the discovery requests made in th[e] [civil] case, and has not requested any information about the discovery sought. [Jenkins] has been providing *unsolicited* information to the appropriate law enforcement officials since the time of her daughter's kidnapping and plans to continue to do so until such time as [IMJ] is located and returned safely home." Docket 52–1 at 4 (emphasis in original).

In support of his motion to suppress the Government's use of these civil discovery materials, Zodhiates relies primarily on a single civil case from the Second Circuit, in which the court stated that "it may be improper for the Government to institute a civil action to generate discovery for a criminal case." *Doctors' Ass'c, Inc. v. Weible,* 92 F.3d 108, 116 (2d Cir.1996) (internal quotation marks, citations, and brackets omitted). Zodhiates, however, has not pointed to any evidence (nor, for that matter, has he even alleged) that the Government "institute[d]" the civil action that parallels this case. At most, he asks the Court to draw inferences from timing: that because one event (the Government's issuance of a subpoena to Response Unlimited) followed another (Response Unlimited's production of documents to Jenkins) the Government has improperly utilized Jenkins' civil suit as a way to obtain documents and information for this case.

 This is simply too much. The Court finds nothing remarkable about the fact that a putative victim of an alleged crime would share evidence related to that crime with the Government. And Zodhi-

ates points to no authority prohibiting such unsolicited disclosure. To the contrary, the Government "may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant demonstrates that such use would violate his constitutional rights or depart from the proper administration of criminal justice." *United States v. Teyibo,* 877 F.Supp. 846, 855 (S.D.N.Y.1995) (concluding that such problematic cases include those in which "the Government pursued a civil action *solely* to obtain evidence for a criminal prosecution" or where there are "other special circumstances suggest[ing] that the criminal prosecution is unconstitutional or improper") (emphasis added). Zodhiates has not come close to making this showing. Accordingly, his motion to suppress evidence acquired by the Government in Jenkins' civil lawsuit is denied.

### 4. Motion to dismiss Count II and part of Count I of the superseding indictment

 Next, Zodhiates moves to dismiss Count II of the indictment, which alleges that:

> On or about September 22, 2009, in the Western District of New York, and elsewhere, the defendants, LISA MILLER, PHILIP ZODHIATES, and TIMOTHY MILLER, with intent to obstruct the lawful exercise of parental rights, did knowingly remove, and aid and abet the removal of, a child, J1, a person known to the Grand Jury, from the United States.

Docket 41 at 3. Zodhiates also moves to dismiss Count I of the indictment, which alleges a conspiracy to violate the IPKCA, "to the extent [Count I] challenges the removal of [Ms. Miller's daughter]." Docket 70 at 21.

Zodhiates' argument is as follows. The IPKCA requires the Government to prove,

among other things, that a defendant acted "with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a) But, Zodhiates notes, the IPKCA also provides that "[i]t shall be an affirmative defense" that the defendant "acted within the provisions of a valid court order granting the defendant legal custody or visitation rights and that order ... was in effect at the time of the offense." *Id.* § 1204(c)(1).

Zodhiates next observes that the superseding indictment "does not allege that Lisa Miller could not legally remove [her daughter] from the United States." Docket 70 at 21. To the contrary, Zodhiates argues that the Vermont family court did not grant Jenkins' motion transferring custody from Lisa Miller to Jenkins until approximately two months *after* Miller left the United States with her daughter. *Id.* at 23. Thus, Zodhiates argues that "[b]ecause Lisa Miller was allowed to leave the country with [her daughter]" in September 2009, Zodhiates "would not have violated any law by allegedly assisting with the departure of Ms. Miller." *Id.* at 22. On this basis, Zodhiates moves to dismiss Count II (aiding and abetting a violation of the IPKCA) and Count I (conspiracy to violate the IPKCA), to the extent Count I alleges a conspiracy to commit an illegal "removal."

▮ In effect, Zodhiates' motion previews his defense at trial and asks the Court to make rulings based on that preview. However, "[t]here is no federal criminal procedure mechanism that resembles a motion for summary judgment in the civil context." *United States v. Yakou,* 428 F.3d 241, 246 (D.C.Cir.2005). Instead, an indictment "can be challenged on the ground" (among others) "that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov,* 676 F.3d 71, 75–76 (2d Cir.2012). But that is not what Zodhiates' motion

seeks. Rather, it raises questions and issues that are procedurally premature.

▮ To begin, an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). An indictment is therefore "sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998) (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). The indictment therefore "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id.*

▮ The superseding indictment in this case satisfies that standard. The relevant provision of the IPKCA makes it a crime to "remove[ ] a child from the United States, or attempt[ ] to do so, or retain[ ] a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). Count II charges that, "[o]n or about September 22, 2009, in the Western District of New York, and elsewhere, the defendant[ ] ... PHILIP ZODHIATES ... with intent to obstruct the lawful exercise of parental rights, did knowingly ... aid and abet the removal of[ ] a child ... from the United States." Docket 41 at 3. There can be no question that Count II of the superseding indictment "accurately stat[es] the elements of the offense charged and the approximate time and place of the [crime] that defendants allegedly conspired to commit." *Alfonso,* 143 F.3d at 776. Zodhiates is therefore provided "sufficient detail to allow [him] to prepare a defense

and to invoke the protection of the Double Jeopardy Clause." *Id.* For the same reasons, Count I undoubtedly properly alleges a conspiracy to violate the IPKCA.

Zodhiates does not appear to contest any of this. Rather, his argument for dismissal is best characterized in one of two ways. First, Zodhiates' argument appears to challenge the sufficiency of the Government's evidence on the element of intent: that he could not have "inten[ded] to obstruct the lawful exercise of parental rights," 18 U.S.C. § 1204(a), because, pursuant to orders of the Vermont family court, Lisa Miller had lawful parental rights at the time she removed her daughter from the United States.[14]

A pretrial motion to dismiss, however, may be granted only if "the motion can be determined without a trial on the merits." Fed.R.Crim.P. 12(b)(3). That is not the case here. In its briefing, the Government argues that, "[a]t the time Lisa Miller kidnapped IMJ in September 2009, Janet Jenkins had parental rights" (in the form of visitation rights) and that the Government "is confident that it has evidence to prove that Mr. Zodhiates was aware of Ms. Jenkins' visitation rights." Docket 72 at 33. This statement, and the Government's other factual assertions underlying it, is not "what can fairly be described as a full proffer of the evidence [the Government] intends to present at trial," which might permit the Court to consider the sufficiency of the evidence in a pretrial motion to dismiss. *Alfonso,* 143 F.3d at 776–77. *Compare with id.* at 777 (observing that, in another case, "the government had filed an affidavit making a full proffer of the evidence to be presented at trial"). Thus, to the extent Zodhiates' motion to dismiss argues that there is insufficient evidence of his alleged "intent to obstruct the lawful

exercise of parental rights," 18 U.S.C. § 1204(a), the motion must be denied.

■ As Magistrate Judge McCarthy observed, Zodhiates' motion to dismiss could also be characterized as one based on the Government's "failure to allege the inapplicability of the affirmative defense provided by § 1204(c)(1) for individuals who act within with the provisions of a valid court order in effect at the time of the offense." Docket 66 at 24. As was true of the first characterization of Zodhiates' motion, this one is also premature. "It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses." *United States v. Sisson,* 399 U.S. 267, 288, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Rather, "[w]here a defendant asserts an affirmative defense that is not plain from the face of the indictment and that he or she bears the burden of proving, there must usually be a factual determination of the merits of the charged offense, which must be made at trial by the jury in the first instance." *United States v. Hoskins,* 73 F.Supp.3d 154, 161 (D.Conn.2014).

For these reasons, Zodhiates' motion to dismiss Count II and part of Count I of the superseding indictment is denied.

### 5. Motion to dismiss for cumulative misconduct

■ Zodhiates also moves to dismiss the indictment "on the basis of cumulative misconduct by the Government," arguing that "at each stage of its investigation, the Government has violated [his] constitutional rights." Docket 70 at 23. More specifically, Zodhiates repeats his previous grand jury argument, claiming that "[t]he indictment should be dismissed based on the Government's forum shopping in violation

---

**14.** This is, of course, Zodhiates' characterization of the relevant evidence and law. The Court expresses no opinion on whether either is correct.

of the vicinage right guaranteed by Article III and the Sixth Amendment." *Id.* This argument for dismissal, however, is predicated on a successful argument that Zodhiates has a right to be investigated by a grand jury drawn from his local community. As discussed above, that argument is without merit.

Zodhiates also argues that "[t]he indictment should . . . be dismissed based on the cumulative investigatory misconduct" described throughout his motion, as well as Zodhiates' allegation that the Government violated Federal Rule of Criminal Procedure 6(e) by "publicly disclosing the grand jury testimony of one of Mr. Zodhiates's daughters." *Id.* Once again, this argument is without merit.

■ "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." *United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997). Although the circumstances surrounding the Government's alleged disclosure of grand jury testimony are unclear, even if true, they certainly do not turn these proceedings into ones that are "fundamentally unfair or shocking to our traditional sense of justice." *Id.*

Moreover, this argument also assumes that the Court finds merit in Zodhiates' other motions. Because the Court does not, Zodhiates' motion for dismissal based on the Government's alleged cumulative misconduct is also denied.

### 6. Motion to confirm scope of previous order

■ Finally, Zodhiates moved before Magistrate Judge McCarthy for "an order confirming," as the court did in Kenneth Miller's case, "that to prove the[ ] charges [in the superseding indictment], the Government must prove intent to violate lawful parental rights established by court order in place as of September 2009," the date of the alleged criminal conduct in this case. Docket 18 at 13. Magistrate Judge McCarthy denied this motion without prejudice to renewal before this Court. In his objections, Zodhiates "notes for the record that he continues to assert . . . his arguments regarding that issue." Docket 70 at 25.

This motion is effectively a request that the Court rule now on how it will instruct a jury as to 18 U.S.C. § 1204(a)'s intent element. That request is premature. Accordingly, the Court denies Zodhiates' motion without prejudice. Zodhiates may, however, renew his motion closer to trial as part of his proposed jury instructions.

### CONCLUSION

For the reasons stated above, each of Zodhiates' pending pre-trial motions, other than his motion for clarification on the element of "intent" in this case, is denied. **SO ORDERED.**